DOUGHERTY v. THE STEAMER FRANCONIA, etc.

(*District Court, S. D. New York.* July 27, 1880.)

1. COLLISION—NEGLIGENCE—TUG.—A tug having a steamer on her port hand, so that if they both kept on they would pass at a safe distance, at flood tide, at a point where the peculiarities of navigation made it difficult to pass each other at that time, has no right, at the distance of a quarter of a mile or less, to attempt to cross the bow of the steamer, without receiving a concurring signal in reply to her two whistles, indicating a change of course.

2. SAME—SAME—STEAMER.—It was negligence upon the part of the steamer not to have noticed the whistles of the tug.

3. SAME—SAME—BURDEN OF PROOF.—Where a vessel has violated a known rule of navigation, and that violation of duty may have contributed to the disaster, the burden is on her to prove that the fault did not contribute to the collision.

4. SAME—SAME—INNOCENT THIRD PARTY.—In such case an innocent third party has the right to recover his damages against either of the offending vessels, however unequal their respective faults may have been.

    *The Atlas,* 93 U. S. 302.

*E. D. McCarthy,* for libellant.

*W. R. Beebe* and *F. A. Wilcox,* for claimant.

CHOATE, D. J.   This is a libel by the owner of the barge Hope, to recover for the loss of the barge and her cargo of coal.   She was in tow of the steam-tug George L. Merkle, on a voyage from Jersey City to Port Chester, on the twenty-sixth day of November, 1878.   She was lashed to the port side of the tug.   Off Ward's island, in the East river, between 6 and 6 : 30 o'clock in the morning, and about 300 feet from the shore, the tug and tow came into collision with the steamer Franconia, a propeller belonging to the Maine Steamship Company.   From the effects of the collision the tug and tow soon after sunk, and became a total loss.   This libel was filed against both the Franconia and the tug, charging each with negligence, which caused or contributed to the collision.   The monition, however, was not served upon the tug, and the suit is prosecuted against the steamer alone.

The morning was clear and cold, and at the time of the collision it was still dusk—not light enough to take down the vessel's lights. The Franconia was coming from the eastward, on her voyage to New York, by way of Long Island sound. She passed on the west side of the buoy in the channel, off Sunken Meadow, and kept on in a straight course down the river, drawing a little nearer to Ward's island side as she came on. Her master, mate, and quartermaster were in the pilot-house, and she had two men stationed forward on the lookout. The tide was flood, running about four miles an hour. Her speed was about eight knots through the water. When she got up opposite Ward's island her lookout and pilot observed the red light of the tug on the port bow. It bore from a point to two points on the port bow, and was reported as a "red light on the port bow." At this time the steamer was just coming up with a schooner, bound to the eastward, on a course nearly parallel with that of the Franconia, and which passed the steamer before the collision. The schooner was on the steamer's starboard hand, between her and Ward's island, and passed at a distance of about 100 feet from the steamer. She had the wind about abeam, on the port side, and her booms were off to starboard, but she did not obstruct the view of those on the steamer down the river. When first observed, the vessel bearing the red light, which proved to be the George L. Merkle, was somewhat more than a quarter of a mile distant. She had just before rounded Negro Point, and was headed up the river upon a course about parallel with that of the Franconia. Her master had been at the wheel till they passed Hallett's Point, but went into the cabin before coming in sight of the steamer, leaving a deck hand at the wheel. She had no lookout. She was a small tug, but well able to .manage her tow, and was going through the water about two and a half to three miles an hour. When first seen from the steamer she appeared to be on a course which would carry her safely by the port side of the steamer, if she. kept her course. She was down below, or to the westward of, the bluff or point of Ward's island. It is usual for all steamers meeting at that part of the river, on the flood

tide, to pass each other to the right. In coming from the eastward, towards Negro Point, the effect of the flood tide is more and more to set a vessel towards the Long Island shore. At the bluff the navigable channel is about 250 yards wide, the shore being bold on both sides, with deep water quite close to the shore.

The Franconia, just before coming up to the steamer, starboarded a very little to give her a wider berth. She then ported a little to come back to her former course, and kept a port wheel, but without any material change in her course up to the time of the collision. After passing the schooner, those in charge of the steamer observed what appeared to them a very sudden and unexpected change in the course of the tug. Her red light disappeared, and her green light appeared. She was then, as it appeared to them, not more than 500 or 600 feet from the steamer, and still on her port hand. She was evidently crossing the bows of the steamer to pass her on the starboard hand. Immediately after this movement was observed, the tug gave a signal of two whistles, indicating this purpose on her part. Thereupon bells were instantly rung on the steamer to slow, stop, and back at full speed. The bells were promptly obeyed, but the distance was too short to avoid a collision, and the tug, keeping on her sheer to port, came in collision with the bluff of the steamer's port bow. The lines between the tug and the barge were parted by the sudden stopping of the tug; the barge shot ahead of the tug; the steamer was nearly or quite still by the land. The tug and barge were carried by the tide up the river, the tug on the steamer's port side, and the barge on her starboard side. Both received injuries, from the effects of which they sunk in about 15 minutes.

The crew of the tug, and the man in charge of the barge, were rescued by a boat from the schooner. Up to the time those on the steamer saw the red light change to green, they had heard or observed no signal from the tug. Up to that time it is certain the steamer had given no signal to the tug. The only signal the steamer gave at all was a single whistle, upon receiving the signal of two whistles after the change of light

was seen, It is claimed, on the part of the steamer, that the tug gave no signal previous to giving these two whistles, which she heard and answered just before the collision. The proof, however, is, I think, satisfactory that before giving these two whistles, and when the two vessels were considerably further apart, and just before the man in charge of the tug starboarded his wheel to cros the bows of the steamer, he gave a signal of two whistles, which were not observed on board the steamer, and to which the steamer made no reply. Although the five witnesses from the steamer testify, with great positiveness, that they were watching the tug, and heard no such signal, it is positively testified to by the man at the wheel of the tug, and he is corroborated by three impartial and intelligent witnesses from the schooner, which was then a little nearer to the tug than the steamer was.

The master of the schooner had a good opportunity to observe the tug. He noticed her when she blew the first two whistles. He observed that she immediately began to change her course and draw in towards the Ward's island shore. He observed that the steamer did not reply. The distance between the steamer and the tug, when this first signal was given, cannot be determined with certainty. The testimony on that point is conflicting. I think the weight of the testimony is that they were from an eighth to a quarter of a mile apart. It appears to have been about the time or very soon after the red light was seen from the steamer, and just about the time the steamer was lapping the schooner.

It is objected by the learned counsel for the steamer that the change of course on the part of the tug cannot have been when the vessels were so far apart; and it is thought to be demonstrated that this is so, because the course of the tug was only about 150 feet on the port hand of the course of the steamer, and, although the tug kept on her starboard wheel all the time, after changing, she made only just distance enough to port to come up to the line the steamer was on before the collision. Hence it is argued that she can have run only a very short distance under her starboard wheel. The demonstration, however, fails for want of certainty in the ele-

ments of the problem, and the argument overlooks, as it seems to me, some important facts. The vessels were approaching each other at the rate of a quarter of a mile—1,320 feet—in a minute and a quarter. The tug changed her course at least four points. Of course, the change would be very gradual at first, especially with the tow she had. The distance between their respective courses is not certainly known. It is a mere judgment of the witnesses, partaking very much of the nature of a conjecture, aided by their recollection or present impression of the bearing of the red light on their bow, and of their estimate of its distance.

The tide being with the tug, her absolute motion was more rapid than that of the steamer in the ratio of seven to five, or thereabouts. I think it is by no means improbable upon the evidence, therefore, that the tug run 770 feet, her proportion of the quarter of a mile, before she had changed her course four points and reached the line of the steamer. Moreover, the testimony is strong that there was a considerable interval between the two signals from the tug; that during that time she was on the swing; and I think this is confirmed by the fact that those on the steamer testify distinctly that the whistle they heard was after the tug showed them her green light. Considering the short distance at which she then was, and her bearing, as testified to by these same witnesses, it is evident that the tug had already swung under her starboard helm a large part of the four points she had to swing. The testimony of the man in charge of the tug as to distances is, I think, particularly unreliable. He makes all his distances very short. His testimony in this respect is controlled and corrected by the other testimony.

Upon this state of the facts it is quite evident, and it is not disputed, that the tug was grossly in fault. Having the steamer on her port hand, so that if both kept on they would pass at a safe distance, she had no right, at the short distance of a quarter of a mile or less, to attempt to cross the bow of the steamer; at any rate, without receiving a concurring signal in reply to her first two whistles. She was in fault in chang-

ing her course at all till the steamer answered her two whistles by two whistles. The fault was especially gross because of the peculiarities of the navigation at this point making it difficult for steamers to pass on the flood tide otherwise than these two were passing before the tug first changed her course. She was also at fault in having no proper pilot at the wheel and no lookout.

The real question in the case, however, is whether the Franconia is not also chargeable with negligence which contributed to produce the collision. If such was the fact, the libellant, as an innocent third party, has the right to recover his damages against either of the offending vessels, however unequal their respective faults may have been. *The Atlas,* 93 U. S. 302.

That it was a fault, or omission of proper caution or diligence, on the part of the steamer not to notice the first signal of the tug, cannot be doubted. The steam-whistle of the tug is shown to have been loud enough to be distinctly heard a mile or more, and this particular signal was distinctly heard on the schooner. The reason why it was not heard or noticed on the steamer is immaterial. As suggested by counsel, those on the steamer may have then been especially attending to the schooner, and to their movements to pass her safely. Or it may be that, seeing the tug safely, as they thought, on their port hand, and having no reason to expect any other movement on her part except to keep her course, they expected no signal and anticipated no trouble from her, and so their attention was remitted. But the duty of keeping a good lookout never ceases, and her position relatively to the steamer was clearly such as to require that her movements should be watched and her signals observed. This was not done. It was a fault, but did it contribute to the collision? Under the rules of navigation, also, the tug having given a signal was entitled to an answer. Her signal was a proposition to the steamer to pass each other on the starboard hand. The steamer made no answer. This was also an omission of a duty imposed on the steamer. Did

this additional fault alone, or in connection with the failure to notice the signal at all, contribute to the collision? The argument for the steamer is that it did not, because the steamer did exactly what she would have been bound to do if she had heard and answered the signal with a single whistle.

It is argued that the steamer had the right to assume that, unless the signal of the tug was answered by two whistles, the tug would not change her course; that the steamer, unless she concluded to do as the tug desired her to do, and answered with two whistles, was bound to keep her course as she did do; that she was not bound to slow or stop, while the tug was thus bound to keep her course. It seems to me, however, that the principle here applies that where a vessel has violated a known rule of navigation, and that violation of duty may have contributed to the disaster, the burden is on her to prove that the fault did not contribute to the collision, and that this has not been proven in this case. If the steamer had noticed the signal and replied to it with one whistle, as she was bound to do, if disagreeing with the change of course proposed by the tug, then it cannot be shown that this replying signal would not have had the effect upon those in charge of the tug which, under the rules, it ought to have, even if they had already, in violation of the rules, changed her course without waiting for a reply to their signal. The duty of the tug would then have been either to reverse her wheel and pass port to port, or to slow and stop if that could not be safely done. How can it be presumed that this would not have happened? And in either case the collision would probably have been avoided. But, whether this is so or not, I think, upon the testimony, the change of course on the part of the tug could and should have been sooner observed from the steamer. It was observed sooner on the schooner. It was light enough for the hulls of the vessels to be made out, and, upon the whole testimony, I think it is a proper conclusion that if a good lookout had been kept on the steamer not only would the signal of the tug, indicating that she was proposing to pass on the starboard side of the steamer, have

been heard, but it would also have been seen that she immediately began, upon this signal, to swing to port in a way to involve serious risk of collision with the steamer if both kept on at full speed. I think the sheer of the tug could and should have been observed seasonably to have enabled the steamer, by slowing and stopping, to have avoided the collision. The same inattention or undue sense of security which led those on the steamer to overlook the whistles intended as a signal for them, led them also to overlook the movement of the tug to port till she was so close upon them that it was too late to avoid the collision by stopping and backing. The proof of that inattention which led to not noticing the signal renders very probable the further omission to observe carefully the movements of the tug, and, upon the whole testimony, I think the steamer was in fault in not sooner observing the change of course of the tug, and in not sooner slowing and stopping to avoid the danger produced thereby.

Decree for libellant, with costs, and a reference to compute damages.