**MID-SOUTH TOWING COMPANY and Power Transportation Company**

v.

**The M/V NEW FRONTIERS, her engines, tackle, etc., in rem, and Greyhound Shipping Corporation, in personam.**

Civ. A. No. 67-784.

United States District Court,
E. D. Louisiana.

Jan. 12, 1972.

Frank C. Allen, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiffs.

J. Dwight LeBlanc, Jr., of Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., for defendants.

CHRISTENBERRY, District Judge.

This matter came on on a former day for trial without a jury. Now, after due consideration of the arguments of counsel, the evidence adduced at the trial and the memoranda of counsel, the court makes the following findings of fact and conclusions of law on the question of liability:

## FINDINGS OF FACT

1. The M/V NEW FRONTIERS is ·an ocean-going freighter about 603 feet in length, about 85 feet in width drawing about 12 feet forward and about 20 feet aft and is owned by Greyhound Shipping Corporation which is a foreign corporation organized and existing under laws other than the United States.

2. The Tug MABA KELCE is approximately 180 feet in length and was pushing a tow of loaded coal barges 5 abreast and 5 deep or pushing a total of 25 barges making the 5 barges abreast about 180 feet in width and the 5 barges deep about 975 feet in length which means that the entire flotilla was about 1155 feet in length; the Tug MABA KELCE and one of the damaged barges of the flotilla was owned and operated by Power Transportation Company which is a corporation organized under the laws of the State of Florida, and the other damaged barge in the flotilla was

owned by Mid-South Towing Company which is a corporation organized under the laws of the State of Florida.

3. The M/V NEW FRONTIERS on March 5, 1967, was properly manned. The key personnel standing watch on board were her compulsory pilot, Captain Richard E. McNeely; her master, Captain K. Kunkenrenken; her Chief Mate, Juergen K. Kurth, both of whom were on the bridge; her Second Officer, Rolf G. Hukrire, who was stationed on the bow as a lookout; and her Second Engineer, Siegfried L. Haack, who was in control of the engines of the NEW FRONTIERS, in addition to other members of the crew.

4. The MABA KELCE, pushing 25 barges, was piloted by Edward W. Rowley. A deckhand, Daniel Smith, was in the pilot house but he did not observe what was occurring until just before collision. The Second Mate, Dallas Glodo, also was in the pilot house. There was no bow lookout whatsoever on the barges which were being pushed by the MABA KELCE.

5. Between 1500 and 1700 on March 5, 1967, the weather was clear and visibility was excellent in the area of the Tenneco wharf; there was little current in the Mississippi River and there was a southwest wind of about 18–20 miles per hour. The wind caused an anchored vessel to swing so that the channel by the Tenneco wharf was restricted to approximately 725 feet in width. There is conflicting testimony on this point but no witness indicated that the channel was restricted to less than 500 feet and the court from all the testimony concludes the channel was restricted to approximately 725 feet in width.

6. The opening in the channel was greater than the Mississippi Gulf Outlet which only has a channel width of 500 feet and was sufficient for both vessels to pass through simultaneously.

7. The Tug MABA KELCE and barges were proceeding down river and passed an upbound freighter, the BAUNE, starboard to starboard (a two-whistle passing) just below the Chalmette slips by the intake piling; this placed the Tug MABA KELCE close to the right ascending bank or east bank. During the radio communication, the Tug MABA KELCE and tow became aware that there was another upbound freighter about a mile astern the BAUNE coming upriver.

8. Captain McNeely on the NEW FRONTIERS attempted several times to contact the MABA KELCE and tow via radio on Channel 13 but was unsuccessful at first. Thereafter, there was radio communication on Channel 13 between the NEW FRONTIERS and MABA KELCE and tow in which both vessels agreed to a one-whistle passing or to a port to port passing; at this time the two vessels were not in sight of each other.

9. After the radio agreement to a port to port passing, Captain McNeely directed the NEW FRONTIERS slightly to her starboard or to the right ascending or east bank.

10. Thereafter, the two vessels sighted each other and exchanged a one-whistle signal for a port to port passing as previously agreed to via radio prior to sighting. The NEW FRONTIERS went from "half ahead" to "slow ahead" and altered her course more to her starboard or toward the right ascending or east bank in order to effect the port to port passing agreed upon. The MABA KELCE and tow seemed to be canted with the head of the tow headed slightly toward the left ascending or west bank, but the stern of the tow was still favoring the right ascending or east bank, and her stern was still close to the right ascending or east bank, and she appeared to be attempting to go to her starboard or to the left ascending or west bank, and the NEW FRONTIERS assumed that she would go more to the left ascending or west bank in order that the previous port to port passing could be effected.

11. Captain McNeely on the NEW FRONTIERS, however, noted as the MABA KELCE and tow came down that

the tow seemed to be "sliding" down river on an angle and that the tow might not be leaving enough room for the agreed port to port passing. The NEW FRONTIERS seeing this stopped her engines, altering her course more to her starboard or toward the right ascending east bank so that she would just barely clear the lower end of the Tenneco wharf.

12. Captain McNeely on the NEW FRONTIERS attempted to contact the MABA KELCE by radio asking for more room in which to pass the tug and tow.

13. The NEW FRONTIERS, seeing that the MABA KELCE pushing 25 barges was not going to give sufficient room, went to emergency full astern in an effort to avoid a collision, but to no avail as the tow slid sidewards toward the port bow of the NEW FRONTIERS.

14. The MABA KELCE and 25 barges continued down river at an angle across the channel and appeared to be sliding or "crabbing" down the river. The tug and tow struck the NEW FRONTIERS by the # 1 hatch where the flare of the bow stops and the straight run of the side of the vessel begins. The NEW FRONTIERS was still going astern at the time of collision and was making very little if any headway. After collision the bow of the NEW FRONTIERS came very close to striking the lower end of the Tenneco wharf and the NEW FRONTIERS had to go hard port and full ahead to keep the bow from hitting the lower end of the wharf; after the bow and forward part of the vessel barely cleared the wharf the helm was placed hard starboard to allow the stern to clear the lower end of the Tenneco wharf and only because of this prompt action did the NEW FRON-TIERS avoid a collision with the lower end of the Tenneco wharf located on the right ascending or east bank.

15. The Tug MABA KELCE did not at any time reduce speed prior to the collision and she was too close to the right ascending or east bank for the agreed port to port passing.

16. There was damage to the port side of the NEW FRONTIERS by the # 1 hatch in the amount of $28,447.04; and there was damage to two of the barges in the tow, i. e., the barge PTC-517 and the barge MST-60. The total damage sustained by these two barges and the Tug MABA KELCE was in the amount of $5,014.40.

17. The operators of the tow were negligent for failure to keep the tow under control and/or for attempting a port to port passing under the circumstances and/or for failure to have a bow lookout on the barges which hindered the maneuvering of such a large tow in a congested harbor. The tow was further unseaworthy for failure to maintain a bow lookout.

18. There was no evidence that the NEW FRONTIERS was unseaworthy. The court further concludes from the evidence presented that the NEW FRONTIERS was not operated negligently and the court believed the witnesses who testified on behalf of the NEW FRONTIERS.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the causes and venue is properly laid in the Eastern District of Louisiana.

2. The rules for navigation of harbors, rivers, and inland waters, more commonly known as the Inland Rules, are applicable. 33 U.S.C. § 154 et seq. (1964).

3. Inland Rules, Article 18, Rule I, 33 U.S.C. § 203 (1964), in pertinent part states:

Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other.

4. The vessels agreed by radio and by one-whistle signals to a port to port passing and this is a clear expression of each vessel's intention. Griffin on Collision at 205 (1949).

 5. The operators of the tow were negligent in failing to maintain control of their tow and in allowing it to slide or "crab" at an angle downstream thereby not giving the NEW FRONTIERS sufficient room to effect a port to port passing as agreed to by the two vessels which were meeting end on or nearly so and this failure of the tow is a statutory failure under the Inland Rules, Griffin on Collision at 69 (1949); Dougherty v. The Steamer Franconia, 3 F. 397 (S.D.N.Y.1880); The Valley Forge, 124 F. 192 (3d Cir. 1903); Warrior & Gulf Navigation Co. v. the M/V Bayou Plaquemine, 1964 A.M.C. 1501 (S.D.Ala.1964).

6. The operators of the tow were guilty of serious fault in failing to reverse their engines.

7. The operators of the tow were guilty of serious statutory fault in failing to have a bow lookout. United States v. M/V Wuerttemberg-Swerve, 1963 A.M.C. 1554 (E.D.S.C.1963).

8. If the Tug MABA KELCE and 25 barges could not maneuver safely to her side of the channel, i. e., toward the left ascending or west bank, she should have stopped and backed and so notified the NEW FRONTIERS. The New York, 175 U.S. 187, 201, 20 S.Ct. 67, 44 L.Ed. 126 (1899).

9. The NEW FRONTIERS sounded the proper passing signal which was agreed to by the tow and she had the right to proceed ahead at reduced speed on her right hand side (right ascending or east bank) of the channel on the assumption that the appropriate passing would be made and she did go full astern when the tow did not give sufficient room for a port to port passing. Pure Oil Co. v. Jack Neilson, Inc., 135 F.Supp. 786, 1956 A.M.C. 221 (E.D. La.1955), aff'd, 233 F.2d 790 (5th Cir. 1956).

10. In the opinion of the court there was no fault on the part of the NEW FRONTIERS which contributed to the collision; she stayed as close as possible to the right ascending-east bank, and stopped and reversed her engines in an effort to avoid collision. Compania De Maderas De Caibarien, S. A. v. The Queenston Heights, 220 F.2d 120, 123 (5th Cir.), cert. denied, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955).

11. The sole and proximate cause of the collision was on the part of the Tug MABA KELCE and tow.

12. The M/V NEW FRONTIERS was seaworthy.

13. Accordingly, judgment will be entered in favor of defendant Greyhound Shipping Corporation, owner of the M/V NEW FRONTIERS, and against Mid-South Towing Company and Power Transportation Company in the amount of $28,447.04.