# Lea, *et al v.* Iron Belt Mercantile Co.

*Bill by Judgment Creditor of Insolvent Corporation to Condemn an Unpaid Stock Subscription.*

(Decided July 6th, 1906.    42 So. Rep. 415.)

1. *Corporations; Stockholders; Liability for Debts; Stock Issued for Insufficient Consideration.*—Where members of a corporation paid for the stock issued to them· by conveying land at an agreed valuation, which was considerably over-valued, a subsequent creditor, who had full knowledge of the fact, cannot compel a stockholder, on the insolvency of the corporation, to pay the difference between the value of the land conveyed by · him and the par value of the stock.

2. *Same; Officers and Agents; Knowledge of Agents.*—Where the agent of a corporation, being the sole manager and almost sole stockholder of the corporation, was personally interested in a transaction with the insolvent corporation, and his transactions with the insolvent corporation was for the joint benefit of himself and his corporation, his knowledge of the fact that the subscriptions to the insolvent corporation stock were paid in over-valued land, was imputable notice to his·corporation.

3. *Same.*—The rule that the knowledge of an agent prior to the creation of the agency·is not notice to the principal, does not apply where the agent was the alter ego of the principal, which he represented, and had absolute dominion over its affairs and was jointly interested with the principal in the transaction.

[Lea, *et al.* v. Iron Belt Mercantile Co.]

APPEAL from Calhoun Chancery Court.

Heard before Hon. R. B. KELLY.

Bill by the Iron Belt Mercantile Company against Preston Lea and the Piedmont Land & Improvement Company. From a decree for plaintiff, defendants appeal.

The facts are sufficiently stated in the opinion of the court.

J. J. WILLETT, for appellant.—The decree pro confesso against the Piedmont Land & Improvement Company was erroneous in the absence of proof of proper service of the summons.—*Independent Publishing Company v. American Press Association,* 102 Ala. 475. The receiver was and is an indispensable party to this proceeding, as the right to the unpaid subscription is in him.—*Proutt v. Hage,* 57 Ala. 28; *Sawyers v. Baker,* 66 Ala. 292; *Lawson v. Ala. Warehouse Co.,* 73 Ala. 290.

The complaining creditor became such with the knowledge that the corporation had received from the stockholder in full payment of his subscription for stock, property at an over-valuation and cannot require such subscribers to pay for its benefit the difference between the par value of the stock and the real value of the land.—*Rickerson Roller Co. v. Farrell Co.,* 75 Fed. Rep. 55; *Hospes v. Northwestern Car Co.,* (Minn.) 50 N. W. Rep. 1117; *Hastings Malting Co. v. Iron Range Co.,* 67 N. W. Rep. (Minn) 652; *Clark v. Beaver,* 139 U. S. 97; *Bank of Fort Madison v. Alden,* 129 U. S. 372; *N. W. Mutual Life Ins. Co. v. Cotton Exchange Real Est. Co.,* 70 Fed. Rep. 155; *Nicrosi v. Calera Land Co.,* 115 Ala. 429; *Carp v. Chipley,* 73 Mo. App. 22 Am. Digest p. 977; *Adamant Manuf'g Co. v. Wallace,* 48 Pacific 415, (16 Wash. 614); *Phelan v. Hazard,* (5 Dillon) Fed. Cases 11068; *Bush v. Robinson,* (Ky.) 26 S. W. Rep. 178; *Cole v. Adams,* 1 J. A. (Texas) 319; *Continental Trust Co. v. Toledo R. R. Co.,* 82 Fed. Rep. 643, (Opinion by Judge Taft); *Bruner v. Brown,* (Ind.) 38 N. E. Rep. 318; *Mathis v. Pridman,* (Texas) 20 S. W. Rep. 1015; 23 Am. & Eng. Ency. of Law, p. 863, (Note

4); *Young v. Erie Iron Co.,* 65 Michigan 127; particular attention is directed to *Hospes v. Car Co.,* and *Hastings Malting Co. v. Iron Range Co., supra.*

The knowledge acquired by the agent was the knowledge of the corporation in this instance, as such agent was the alter ego of the corporation.—2 Pomeroy Eq. Jur. (3rd Ed.) Secs. 670 and 672, and authorities cited in notes thereto.

BLACKWELL & AGEE, and CABANISS & BOWIE, for appellee.—The bill is sustained by the following authorities. —*Eleyton Land Co. v. Birmingham Warehouse & Elevator Co.,* 92 Ala. 404; *Hall v. Henderson,* 21 So. Rep. 1020; *Roman v. Dimmick,* 22 So. Rep. 109. Upon these same authorities the decree of the Chancellor should be upheld.

TYSON, J.—The bill in this case was filed by a judgment creditor of the Piedmont Land & Improvement Company, an insolvent corporation, after execution with a return of "No property found," seeking to condemn an alleged unpaid subscription to capital stock of said corporation made by respondent Lea. When this cause was here on former appeal, the equity of the bill was sustained, not upon the theory that complainant's right to condemn the unpaid subscription was on account of any privity of contract existing between it and the subscriber Lea, or that the statute under which the debtor corporation was organized created a liability which the complainant would have the right to enforce, but solely upon the ground of fraud, in that the complainant, on the facts averred "would be justified in presuming  *  *  * that the law requiring the subscription to stock to be paid in money or in property at its reasonable value had been strictly complied with."—*Lea v. Iron Belt Mercantile Co.,* 119 Ala. 271, 24 South. 28. In *Elyton Land Company v. Birmingham Warehouse Company,* 92 Ala. 407, 9 South. 129, 12 L. R. A. 307, 25 Am. St. Rep. 65, the bill was by a judgment creditor, as here, seeking to subject an unpaid subscription, on the ground that the property was knowingly accepted by the corporation, in discharge

of the subscription obligation, at a valuation grossly in excess of its true value. The court, after an exhaustive examination of the authorities and a careful review of the constitutional and statutory provisions bearing upon the subject of the organization of corporations, held that while the acceptance of the property may bind the corporation, it was not binding on creditors, without notice of the mode in which the stock subscription was undertaken to be paid, because it was a fraud upon them, in that "the capital stock of a corporation constitutes the basis of its credit, and persons dealing with the corporation have a right to assume that the stock has been actually paid in or that it may be reached."

The case now being before us on its merits, the first question to be determined is whether the allegations of the bill charging fraud in the discharge of the subscription obligation by the conveyance of property at an overvaluation are satisfactorily shown by the evidence. It appears that a number of persons, owning or controlling a tract of land costing them about $100,000 organized the Piedmont Land & Improvement Company for the purpose of selling the lands as town lots, and subscribed for $1,250,000 of stock, paying the same, under their contract of subscription, by conveyance of the tract of land, comprising some 2,200 acres. Respondent Lea's subscription was $118,750, which was paid by his pro rata share of the land. The capital stock of the company, to the extent of $250,000, was donated to the company, thus reducing the price at which the land was valued to $1,000,000. The company was organized in January, 1890, took possession of the property, and sold in a few weeks about 200 acres of this land for about $350,000, and the same land shortly afterwards was worth in the market and sold for as much as $700,000. These events occurred during the excitement of the speculative period, in full force at the time of the organization of the company and for some time afterwards. When the collapse came, it was realized that values were based on illusions, and this company, with many others, became insolvent. The fact that this was not an isolated case of adventure, but an example of the

general excitement of the country at that time, and that the expectations of the organizers of this company seemed on the point of full realization, go very far to show that its organization was in entire good faith and without the least purpose to defraud. And so we must take it that the original subscribers for stock intended merely to take advantage of the opportunity and sell through the instrumentality of the corporation their body of land. Still we cannot resist the conclusion, and so hold, that the land conveyed was not at that time of the money value at which it was estimated, and that the corporators must have known that fact, however much they may have believed it would advance in the future.

Having reached this conclusion, we shall now consider the defenses. The respondent Lea, in his answer, after denying the overvaluation of the land conveyed to the company in payment of his stock subscription, asserts that the complainant had notice that his stock subscription had been discharged to the corporation in the manner shown to have been done, and it is insisted that to compel a subscriber to pay otherwise than as he agreed to pay for his stock to a party who knew, before extending credit, how the subscription had been discharged, would be an injustice. The question presented for our determination, in view of the fact that there was an overvaluation, is whether the fact of knowledge by complainant of the over-valuation, if true, is a good defense, and whether this defense is supported by the evidence. The complainant was organized in 1891, and made the loan, the basis of the judgment sought to be enforced, in 1894 or 1895. It therefore became a creditor of the debtor corporation after that corporation had accepted the lands in discharge of the subscription obligations at the overvaluation complained of. It cannot be doubted that if complainant had notice of the actual state of affairs, being a subsequent creditor, it cannot disturb the arrangement between the company and its stockholders. It is impossible, with notice of the character and value of the land, for complainant to have acted on and trusted appearances, rather than the true condition of affairs,

and, therefore, to have been deceived. This seems to be the universal doctrine of the courts. This principle, as well as the one upon which the equity of the bill must rest, are ably discussed by Messrs. Clark & Marshall in their work on Private Corporations, at page 2327. These authors, after showing that assets of a corporation are not a trust fund for creditors in any proper sense, say: "It has been repeatedly held, in the absence of special statutory provisions, that where a corporation issues stock as bonus, or for less than its par value in cash, or for property taken for an overvaluation, the transaction cannot be assailed, and full payment by the stockholders required, by or for the benefit of persons who became creditors before the stock was so issued or who participated in the transaction, or who afterwards dealt with the corporation and became creditors with knowledge, for in neither of these cases is there any fraud as against them." "It is difficult, if not impossible," said the Minnesota Supreme Court, "to explain or reconcile these cases upon the trust-fund doctrine, or, in the light of them, to predicate the liability of the stockholder upon that doctrine. But by putting it upon the ground of fraud, and applying the old and familiar rules of law on that subject to the peculiar nature of a corporation and the relation which the stockholders bear to it and to the public, we have at once rational and logical ground on which to stand. The capital of a corporation is the basis of its credit. It is a substitute for the individual liability of those who own its stock. People deal with it and give it credit on the faith of it. They have the right to assume that it has paid-in capital to the amount which it represents itself as having; and if they give it credit on the faith of that representation, and if the representation is false, it is a fraud upon them; and, in case the corporation becomes insolvent, the law, upon the plainest principles of common justice, says to the delinquent stockholder, 'Make that representation good by paying for your stock.' It certainly cannot require the invention of any new doctrine in order to enforce so familiar a rule of equity. It is the misrepresentation of fact in stating

the amount of capital to be greater than it really is that
is the true basis of the liability of the stockholder in 'such
cases; and it follows that it is only those creditors who
have relied, or who can fairly be presumed to have relied,
upon the professed amount of capital, in whose favor the
law will recognize and enforce an equity against the hold-
ers of bonus stock. This furnishes a rational and uni-
form rule, to which familiar principles are easily applied,
and which frees the subject from many of the difficulties
and apparent inconsistencies into which the trust-fund
doctrine has involved it; and we think that, even where
the trust-fund doctrine has been invoked, the decision in
almost every well-considered case is readily referable to
such a rule." See, also, 2 Morawetz on Corp. § 829;
Cook on Stock and Stockholders (2d Ed.) § 44; *First
National Bank v. Gustin M. Cor. Min. Co.* (Minn.) 44
N. W. 198, 6 L. R. A. 676; 18 Am. St. Rep. 510; *Hospes v.
N. W. M. & C. Co.,* 48 Minn. 174, 50 N. W. 1117, 15 L. R.
A. 470, 31 Am. St. Rep. 637; *Coit v. N. Ca. Am. Co.,* (C.
C.) 14 Fed. 12, s. c. 119 U. S. 343, 7 Sup. Ct. 231, 30 L.
Ed. 420; *Ft. Madison Bank v. Alden,* 129 U. S. 372, 9 Sup.
Ct. 332, 32 L. Ed. 725; note to *Clark v. Bever,* (C. C.) 31
Fed. 676; and other authorities cited on this point on
brief of counsel for appellant. This principle does not
seem to be controverted, but is sought to be avoided only
by a denial of the fact of notice.

The evidence shows  that R. J. Riddle organized  the
complaining corporation, the creditor, and was its presi-
dent and general manager, and that he constituted the
company in all its outside relations with the world. It
was by and through him that complainant made the loan
sought to be recovered in this suit. The evidence further
establishes to our entire satisfaction that Riddle was in-
timately acquainted with the details of the organization
and affairs of the Piedmont Land & Improvement Com-
pany. He was "one of the boomers of the town of Pied-
mont," which was built on the lands subscribed. He was
the confidential selling agent of the company, and receiv-
ed in compensation nearly $8,000 for negotiating sales of
this identical land. He applied to the promoters of the

[Lea, *et al.* v. Iron Belt Mercantile Co.]

scheme to be permitted to participate in the purchase of the lands which were conveyed to the company in discharge of the stock subscriptions. He complained that he had not been let in "on the ground floor" as a stockholder in the company. This he would hardly have done without knowing what was on "the ground floor." It can scarcely be doubted, under the evidence, that Riddle knew that the subscription of Lea had been paid with his interest in the land, that the capital stock of the company consisted of land, and that the subscribers for stock did not contemplate further payments on their subscriptions for stock. Nor can it be seriously doubted that Riddle knew, at the time that the debtor company was organized the value of the land conveyed to it by the stockholders in discharge of their subscription, as well as the amount of the capital stock of the company. If Riddle individually had become the creditor, instead of his corporation, whose affairs he seems to have managed to suit his own pleasure and for his personal benefit, there is no doubt that he could not complain of having been deceived or defrauded. It is in effect conceded that Riddle did have the fullest notice; but it is insisted that his knowledge was not acquired in the course of his agency for or management of the complainant corporation, and, therefore, his knowledge cannot affect the rights of that company. Conceding the soundness of the insistence in a proper case, it is but a rule of evidence, and has its limitations. Under the facts of this case, the rule has no application, and, therefore, can exert no influence in its decision. Here Riddle was personally interested and concerned in the agreement by which the debt now sought to be collected originated. Besides, he was the sole manager and controller of the creditor company at his will—its alter ego—and, it seems, was its sole stockholder but one; the other being a non-resident. Indeed, it is difficult to consider him as other than the creditor corporation itself, so completely were the affairs of it subject to his will and under his immediate control. But in this particular transaction he acted both for himself and for his company. The result of that transaction was the acquisition

[Lea, *et al.* v. Iron Belt Mercantile Co.]

by him personally of $30,000 of bank stock and the note for his company evidencing the loan, and of some $90,000 of collateral. All of this he and his company acquired as part of the consideration for making the loan, constituting the debt which his corporation is now attempting to collect by this proceeding. So, then, we must look upon Riddle in two capacities—one as an individual, and the other as manager of his company. Riddle as an individual and Riddle as manager are found entering into a joint transactios for their joint benefit with the agent of the Piedmont Land & Improvement Company with full legal knowledge of the details of the organization of that company. In short, he as an individual and as manager co-operated in doing an act for their joint interest. As to this particular act or transaction they became as one person, and the knowledge of the one must be imputed to the other. For Riddle as an individual and Riddle as general manager of his corporation could not do a single act for their mutual benefit from different standpoints. It would be a psychological impossibility for him to have had a different consciousness respecting the affairs of the debtor corporation, as general manager of his company, from what he had individually; and so we hold that as general manager he had the same familiarity with the affairs of the debtor company that he undoubtedly possessed individually.—*Anderson v. Kinley,* 90 Iowa, 554, 58 N. W. 909, *Huron Printing Co. v. Kittleson,* 4 S. D. 520, 57 N. W. 233.

It may be well, however, before concluding, to notice the contention of appellee on this point. The insistence is that as Riddle was an agent of his corporation, and acquired the knowledge which we have imputed to his principal antecedent to its organization, the rule applies "that notice to an agent, to bind his principal, must have been acquired by the agent during his employment—i. e., while he is actually employed in the prosecution of his duties as agent—and not at a time antecedent to the period of his agency."—*Goodbar v. Daniel,* 88 Ala. 583, 7 South. 254, 16 Am. St. Rep. 51, and cases there cited. But this principle, as we have said, has no application

to the facts of the case. In all cases where it has been enforced and applied by this court as a rule of evidence, the relation simply of principal and agent existed between the parties. In none of them was the party possessing the knowledge sought to be imputed to the principal anything more than a mere agent. He was not the alter ego of the corporation, as here, and had not the absolute dominion over its affairs, as Riddle is shown to have had. In none of them would the pecuniary interest of the agent have directly affected as in the case of Riddle. Suppose Riddle had acquired the knowledge while manager of his company, in a transaction for it prior to the one here involved, and desired to communicate it to his corporation, to whom would he have communicated it? He was, as we have said, to all intents and purposes the corporation itself. It could be nothing but the sheerest nonsense to say that as agent he should communicate the knowledge to himself as the managing representative of his corporation. Since the corporation could acquire notice in no other way than by and through its managing head or officer, it will scarcely be doubted that notice to such officer is of necessity notice to it.

But this court has not in all cases applied the rule here invoked by the appellee. To the contrary, in a number of them the knowledge of the agent, though acquired in an antecedent proceeding or transaction, although the principal was a complete stranger to that prior proceeding or transaction, was imputed to the principal, and he was charged with the knowledge of his agent. The following are some of these cases:—*White v. King,* 53 Ala. 162; *Dunklin v. Harvey,* 56 Ala. 177; *Wiley, Banks & Co. v. Knight,* 27 Ala. 336; *City Nat. Bank v. Jeffries,* 73 Ala. 183. We have but to read the facts of these cases to see that this is true. So, then, the rule invoked and relied on by appellee has not been uniformly applied by this court, and while the cases last cited make no reference to it, or the cases in which it was applied, there is really no conflict between the two lines of cases. The cases last cited by us must be regarded as being controlled by the limitation put upon the general rule which was applied

in those relied on by appellee. That the application of the general rule as laid down in *Goodbar v. Daniel, supra,* is subject to an important and well-settled limitation, does not admit of serious controversy. It is this: "Where the transaction in question clearly follows and is intimately connected with a prior transaction, in which the agent was also engaged, and in which he acquired material information, or where it is clear from the evidence that the information by the agent in a former transaction was so precise and definite that it is or must be present to his mind and memory while engaged in the second transaction, then the foregoing requisite (general rule) becomes inapplicable. The notice given to or information acquired by the agent in the former transaction operates as constructive notice to the principal in the second transaction, although that principal was a complete stranger to and wholly unconnected with the proceeding or business."—2 Pom. Eq. Jur. (3d Ed.) § 672, and notes; Mechem on Agency, § 721. And this principle is fully applicable to corporations.—Id. § 670, note 2, and cases there cited. See, specially, *Willard v. Denise* (N. J. Err. & App.) 35 Am. St. Rep. 788, and note.

We are not to be understood that this limitation is without its exceptions. The notice or knowledge of the agent will never be imputed to his principal (1) "when it is such as it is the agent's duty not to disclose; (2) When the agent's relations to the subject-matter or his previous conduct renders it certain that he will not disclose it; and (3) when the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal." Mechem on Agency, supra. So, then, if it be conceded that the point under consideration is controlled by the rules governing principal and agent, it may be held, in harmony with our own cases, under the limitation declared by Mr. Pomeroy and Mr. Mechem in their excellent works, that Riddle's knowledge is imputable to his corporation. It would, therefore, necessarily follow that, complainant being chargeable, at the time of the creation

[Stephenson v. Atlas Coal. Co.]

of its debt, with notice of the overvaluation of the land accepted by the debtor corporation in discharge of the stock subscription, it cannot maintain this bill to charge respondent Lea on his subscription. This renders it unnecessary to consider the other assignments of error by appellant Lea.

In reference to the error assigned by the Piedmont Land & Improvement Company, it appears that there is a decree pro confesso, but the decree does not show that the person upon whom the service was had was a person on whom service could be made. That decree is, therefore, erroneous.—*Independent Pub. Co. v. Am. P. Association*, 102 Ala. 475, 15 South. 947.

The decrees of the lower court are reversed, and a decree will be here rendered dismissing the bill.

Reversed and rendered.

WEAKLEY, C. J., and SIMPSON and ANDERSON, JJ., concur.