[Civ. No. 3240.   Second Appellate District, Division Two.—March 1, 1921.]

THE CALIFORNIA NATIONAL SUPPLY COMPANY (a Corporation), Respondent, v. ROBERT F. O'BRIEN et al., Appellants.

[1] CORPORATIONS—WATERED STOCK—LIABILITY OF HOLDER TO CORPORATION CREDITOR—FRAUD—PLEADING AND PROOF.—Where corporation stock is issued as fully paid in exchange for property grossly or fraudulently overvalued, a transferee of such stock who did not participate in the transaction whereby it was originally issued and who took his stock unaware of the character of the transaction is not liable to a judgment creditor of the corporation for any part of the difference between the par value of the stock and the actual value of the property exchanged therefor; and it is incumbent upon the plaintiff, in an action by a judgment creditor against a transferee of such watered stock to allege in his complaint and

---

1. Effect of creditor's knowledge that stock was improperly issued as full paid upon his right to resort to holder for same, notes, 7 A. L. R. 972; 8 L. R. A. (N. S.) 271.

prove at the trial that such transferee, when he acquired his stock, was fairly chargeable with knowledge of the fraudulent transaction whereby the stock, though issued as fully paid up, was issued in exchange for the overvalued property.

[2] ID. — ACTION AGAINST STOCKHOLDERS — THEORY OF TRIAL — CONSTRUCTION OF PLEADINGS—ADMISSION—NEW TRIAL.—Where an action by a judgment creditor of a corporation against transferees of watered stock was commenced and prosecuted to judgment prior to the enunciation of the rule that the plaintiff in such an action must plead and prove that the defendants, when they acquired their stock, were fairly chargeable with knowledge of the fraudulent transaction whereby the stock, though issued as fully paid up, was issued in exchange for the overvalued property, and it is fairly apparent that neither court nor counsel ever had in mind the difference between the liability of those who were parties to the original fraudulent device and that of subsequent stockholders acquiring their stock without notice thereof, a new trial, where that distinction is observed, should be granted, and in such case the affirmative averments of the answers should not be deemed to supply the necessary allegation in the complaint.

[3] ID.—ACTUAL KNOWLEDGE OF FACTS BY CREDITOR—ABSENCE OF FRAUD.—A creditor who deals with a corporation with actual notice that its stock, though issued as fully paid up, was issued in exchange for overvalued property is not deceived by the corporation's apparent or ostensible capitalization, and such creditor not being defrauded by the taking of the overvalued property in payment for stock, there can be no recovery from the holder of such watered stock.

[4] ID. — CONSTRUCTIVE NOTICE OF FRAUD — RIGHT OF RECOVERY. — Though a creditor cannot claim to have been deceived if, when he extended credit to the corporation, he had actual knowledge of all the facts connected with the fraudulent issue of the watered stock, a creditor who possesses only notice of facts sufficient to put an ordinarily prudent person upon inquiry may be actually deceived, in which case a recovery may be had.

[5] ID.—SALE OF TREASURY STOCK—KNOWLEDGE OF FRAUD—LIABILITY OF HOLDER.—Where, in accordance with the original scheme of the promoters of a corporation, part of its stock which was issued in exchange for property that was fraudulently overvalued, after being transferred to the "treasury" of the corporation, is sold for less than its par value, the sale of such stock is subject to the contingency that, in the event of the insolvency of the corporation, the holder of the stock, if fairly chargeable with knowledge of the original fraudulent transaction, is liable to creditors who became such in ignorance of the arrangement and who might rightfully assume that the stock had been fully paid up or that it is subject to call.

[6] Id.—South Mountain Mining Company Case Overruled.—The rule of the South Mountain Mining Company case (7 Sawy. 30), to the effect that the stockholders of a mining corporation are not liable to the corporation's judgment creditors even though their shares were issued as fully paid in exchange for mining properties taken at an overvaluation, no longer expresses the rule in force in California.

[7] Id. — Relation of Stockholder to Corporation — Issuance of Stock Without Consent.—The relation of a stockholder to a corporation is one of contract, either express or implied; and a party cannot be made a stockholder without his consent simply because some officer of the corporation, without authority, enters his name upon the books as a stockholder and causes stock to be issued in his name as such.

[8] Id.—Indorsement and Delivery of Unauthorized Certificate—Ratification.—If one to whom an unauthorized certificate has been issued without his knowledge and consent, instead of returning the certificate to the corporation, indorses it and delivers it to another for transfer, that act, unexplained, is a recognition of ownership, and, consequently, a ratification of the original unauthorized issue.

APPEAL from a judgment of the Superior Court of Los Angeles County. E. P. Shortall, Judge Presiding. Affirmed in part; reversed in part.

The facts are stated in the opinion of the court.

C. C. Mishler, J. J. Wilson, Haas & Dunnigan, John A. Powell and Goodwin & Morgrage for Appellants.

Flint & MacKay for Respondent.

FINLAYSON, P. J.—Plaintiff, a judgment creditor of the Panama Oil Company, a California corporation, brought this action against certain of the stockholders of that company to collect what are claimed to be the unpaid balances on the par value of their shares. Plaintiff had judgment and defendants appeal.

In so far as is material to our inquiry, the case, as disclosed by the findings of the trial court, is substantially this: The Panama Oil Company was incorporated with an authorized capital stock of $2,000,000, divided into 2,000,000 shares of the par value of one dollar each. At the first

meeting of the board of directors, held May 24, 1912, J. B. Hedrick, the president of the company and a leading spirit in its incorporation and organization, presented to the board a written offer to convey to the corporation certain properties, consisting of a lease of certain land supposed to be oil-bearing, certain shares of stock of the Daybreak Oil Company, and an option to purchase certain shares of stock of the Midnight Oil Company, for the sum of $2,000,000, to be paid by delivery of the company's 2,000,000 shares to Hedrick or his order—the shares to be issued as fully paid. This offer was accepted by the board and Hedrick thereupon transferred the properties to the corporation. Three days later, viz., May 27, 1912, Hedrick delivered to the company a written order wherein he directed the corporation to issue to himself 1,000,000 of its 2,000,000 shares of capital stock, and the remaining million to certain of these defendants. Thereupon a certificate for 1,000,000 shares was issued to Hedrick himself, and, at the same time, certificates were issued to such of these defendants as were designated by Hedrick in his order on the company. On the same day a written agreement was entered into between Hedrick and the corporation whereby the former agreed to return to the company, to be held by it in trust, the 1,000,000 shares that had been issued to him, to be disposed of by the corporation for the benefit of its stockholders "with a view to securing the necessary funds with which to carry on the business of said Panama Oil Company, and provide a working capital therefor." Hedrick thereupon indorsed and surrendered the certificate for the 1,000,000 shares that had been issued to him, and a new certificate was issued certifying that the "treasury" of the corporation is the owner of the 1,000,000 shares. The findings of the lower court refer to the 1,000,000 shares so returned by Hedrick to the corporation as "trust fund stock," also as "treasury stock." Subsequently shares of this "trust fund" or "treasury" stock were issued to certain of the defendants for sums considerably less than the par value.

The actual value of the properties transferred by Hedrick to the Panama Oil Company in exchange for all of its 2,000,000 shares of capital stock was $500,000, and no more. The lower court found that Hedrick and the directors of

the Panama Oil Company knew that the properties received by the corporation in exchange for its 2,000,000 shares did not exceed $500,000 at the date of the exchange, and that they caused the 2,000,000 shares to be issued "with the intent to have them appear to have been fully paid for upon their being issued by said corporation."

Thereafter plaintiff sold and delivered to the Panama Oil Company certain goods, wares, and merchandise, for the value whereof it subsequently obtained judgment against that corporation—a judgment for $8,050.56. The Daybreak Oil Company, all of whose issued capital stock was taken over by the Panama Oil Company shortly after the latter's organization, was indebted to plaintiff in the sum of $21,978.31. The Panama Oil Company assumed this indebtedness and gave to plaintiff its promissory notes therefor. These notes were not paid when they fell due, and plaintiff accordingly instituted an action thereon, obtaining a judgment against the Panama Oil Company for $26,561.53. Execution having been issued upon each of these two judgments and returned *nulla bona,* plaintiff brought this action against the stockholders of the Panama Oil Company to make good its two judgments out of what it claims to be the unpaid balances on the par value of their shares.

At each of the times when it extended credit to the Panama Oil Company, which was subsequent to the issuance of the 2,000,000 shares to Hedrick or his order, plaintiff had no actual knowledge of the facts and circumstances under which the 2,000,000 shares had been issued in exchange for properties of the value of $500,000. Neither the Panama Oil Company nor its officers nor any person made any actual disclosure to plaintiff of the difference between the par value of the 2,000,000 shares and the value of the properties received in exchange therefor; nor did plaintiff give credit to the Panama Oil Company with any actual knowledge of any such difference in valuation. So the trial court found. In addition to the findings, thus showing that plaintiff had no actual knowledge of the fraudulent transaction whereby shares of the par value of $2,000,000 were issued for properties worth but $500,000, the trial court further found that at the times when it extended credit to the Panama Oil Company plaintiff and

its officers and agents "had knowledge of facts and circumstances sufficient to put it and them upon inquiry as to conditions and circumstances attending the issuance of all of the capital stock of the Panama Oil Company on May 24, 1912, as in these findings hereinabove fully set forth, and the execution by J. B. Hedrick of the contract dated May 27, 1912, . . . ; and that had plaintiff and its officers and agents prosecuted such inquiry it and they would have learned all of the facts concerning the issuance of said stock and the acquisition of said properties by the Panama Oil Company, . . . and such knowledge would have been acquired by it prior to the time it advanced the aforesaid credit to the Panama Oil Company."

The four points made by appellants in their opening briefs are: 1. According to the trial court's findings, plaintiff had constructive notice of all the facts and circumstances under which shares of the par value of $2,000,000 were issued as fully paid in exchange for properties of the value of $500,000; such constructive notice, so it is claimed, was equivalent to actual notice; therefore it must be held, as a matter of law, that plaintiff did not extend credit to the Panama Oil Company in reliance upon any presumption that the full par value of the 2,000,000 shares had been or would be received by the corporation. 2. Those defendants who hold shares issued from what the court in its findings denominated "trust fund" or "treasury" stock—the 1,000,000 shares that were redelivered to the corporation by Hedrick and later issued as from its treasury—cannot be held liable because, so it is claimed, those shares were issued from the treasury of the corporation for their fair market value to enable the corporation to prosecute its business and develop its properties. Hence, it is argued, those shares are within the doctrine enunciated in such cases as *Clark* v. *Bever*, 139 U. S. 96, [35 L. Ed. 88, 11 Sup. Ct. Rep. 468, see, also, Rose's U. S. Notes], *Fogg* v. *Blair*, 139 U. S. 118, [35 L. Ed. 104, 11 Sup. Ct. Rep. 476]; *Handley* v. *Stutz*, 139 U. S. 417, [35 L. Ed. 227, 11 Sup. Ct. Rep. 530], and *J. F. Lucey Co.* v. *McMullen*, 178 Cal. 425, [173 Pac. 1000]. 3. The case is within the rule of the South Mountain Mining Company case (7 Sawy. 30, 3 Fed. 403), wherein it was held, in effect, that the stockholders of a mining corporation are not liable to the corporation's judgment creditors even

though their shares were issued as fully paid in exchange for mining properties taken at an overvaluation. 4. The evidence is insufficient to support the finding that defendant Wilbert Morgrage is the owner of shares of the capital stock of the Panama Oil Company, and as such liable to judgment creditors of the corporation for the unpaid balance of the par value of the shares standing on the books of the company in his name.

The foregoing are the only points made for reversal in appellants' opening briefs. Since the first submission of the case, however, appellants, by letter addressed to the court, and, later, by oral argument, have made an additional point, presently to be considered—a point based upon the decision of the supreme court in the case of *Rhode* v. *Dock-Hop Co.*, 184 Cal. 367, [12 A. L. R. 437, 194 Pac. 11], handed down by that court some time after the first submission of this case. Under the circumstances, there was, we think, good reason for appellants' failure to make this point in their opening briefs, and we, therefore, are of the opinion that it is within the ex ception mentioned in *Hibernia Sav. & L. Soc.* v. *Farnham*, 153 Cal. 584, [126 Am. St. Rep. 129, 96 Pac. 9], and that the point should be considered.

Passing now to a consideration of appellants' five points: We shall address ourselves to the point last mentioned, since it seems to be the one that necessitates a reversal of the judgment. And since the four points raised in appellants' opening briefs present questions that will arise on a retrial, it becomes our duty likewise to pass upon those questions for the guidance of court and counsel.

[1] 1. In *Rhode* v. *Dock-Hop Co.*, 184 Cal. 367, [12 A. L. R. 437, 194 Pac. 11], it is held, for the first time in this state, that where stock is issued as fully paid in exchange for property grossly or fraudulently overvalued (commonly known as watered stock), a transferee of such stock who did not participate in the transaction whereby it was originally issued and who took his stock unaware of the character of that transaction is not liable to a judgment creditor of the corporation for any part of the difference between the par value of the stock and the actual value of the property exchanged therefor; and further, that it is incumbent upon the plaintiff, in an

action by a judgment creditor against a transferee of such watered stock, to allege in his complaint and prove at the trial that such transferee, when he acquired his stock, was fairly chargeable with knowledge of the fraudulent transaction whereby the stock, issued as fully paid, was issued in exchange for the overvalued property.

In the instant case all of the defendant stockholders, with the exception of the defendant Robert F. O'Brien, appear to be within the reason of the rule announced in the Rhode case, irrespective of whether technically they are "transferees" or not. And if within the reason of the rule, then such defendants must be held to be within the rule itself (Civ. Code, sec. 3511). The reason for the rule enunciated in the Rhode case is substantially this: Where a person acquires and accepts stock which purports to be fully paid, but which, in fact, is not, i. e., where the stock has been watered, the liability of the stockholder to a judgment creditor of the corporation is grounded on fraud, actual or constructive; the liability exists by virtue of the principle that one giving credit to a corporation is entitled to rely upon its ostensible capitalization as the basis for the credit given, and when the corporation issues watered stock, thereby creating the appearance of a capitalization in excess of its real assets, the transaction necessarily involves the misleading of subsequent creditors; and the transaction, therefore, whether done with that purpose actually in mind or not, is at least a constructive fraud upon such creditors. It thus will be seen that a stockholder's liability to a judgment creditor of the corporation is based, not upon his relation to the corporation as a stockholder, but upon a fraudulent transaction—a fraudulent device to evade the law and defeat its useful and wholesome requirements. It follows, therefore, that because fraud, actual or constructive, is the basis of the stockholder's liability, one who did not participate in the original fraudulent transaction, or who acquired his stock in ignorance of that transaction and who is not fairly chargeable with knowledge thereof, taking his stock in the *bona fide* belief that it had been fully paid for, cannot be held liable.

In the case before us the immediate parties to the original fraudulent transaction—fraudulent in its purpose and

effect, in so far as it created an ostensible capitalization of the Panama Oil Company in excess of its real assets— were Hedrick, on the one hand, and, on the other hand, the corporation itself and its seven directors, one of whom was the defendant O'Brien. With the exception of O'Brien it does not appear that any of the defendants was directly a party to, or participated in, the original fraudulent transaction. It follows, therefore, that, with the exception of O'Brien, none of the defendants should be held liable unless it can be alleged and proved that he or she acquired his or her stock under such circumstances as to make him or her fairly chargeable with knowledge of the fraud with which the original transaction was infected. The complaint is wholly void of any allegation purporting to connect any of the defendants with knowledge of the fraudulent transaction that resulted in the issuance of the watered stock, although demurrers, general and special, were interposed and overruled.

It is claimed by respondent that certain averments in the answers of some of the defendants, upon which the court made findings favorable to plaintiff and responsive to the issues thereby tendered, are sufficient to supply the averment, omitted from the complaint, that defendants had knowledge of the nature of the original fraudulent transaction. The answer of the defendants Webb, Fisher, and Levy may be taken as a sample. After denying that they are the owners of any shares of stock in the Panama Oil Company, the answer filed by the defendants Webb, Fisher, and Levy alleges that they are innocent pledge-holders for value and in good faith, "and without notice of any amount due or to become due upon the shares of stock of said corporation . . . and without notice of any claim of plaintiff against defendants or any of them, and without notice of any amount due or claimed to be due for unpaid subscriptions." We do not think that these affirmative averments in the answer of Webb, Fisher, and Levy were intended to be, or were ever understood by any of the parties to be, the equivalent of an allegation that, when they acquired their stock, those defendants had knowledge of the nature of the fraudulent transaction pursuant to which the 2,000,000 shares were originally issued—1,000,000 to Hedrick himself (subsequently transferred to the treas-

ury of the corporation), and the remainder to persons des·
ignated by Hedrick. This conclusion is fortified by the
consideration that it is fairly apparent from the record that
neither court nor counsel ever had in mind the difference
between the liability of a subscriber who was a party to
the original fraudulent transaction and that of a transferee
of such subscriber. Indeed, counsel for respondent ex-
pressly concede that the case was neither tried nor decided,
nor were any of the briefs written, with the doctrine of
the Rhode case in mind, or with the idea that the law
is as there declared, or that it is applicable to the present
case. The answer of the defendant Couse, as well as that
of the defendants Dinsmore and wife, presents the issue
of knowledge somewhat more directly and explicitly than
does that of the defendants Webb, Fisher, and Levy.  [2]
But regardless of what construction may fairly be placed
upon the averments in any of the answers respecting de-
fendants' knowledge of the original fraudulent transaction
between Hedrick and the corporation, we think that where,
as here, it is fairly apparent that neither court nor counsel
ever had in mind the difference between the liability of
those who were parties to the original fraudulent device
and that of subsequent stockholders acquiring their stock
without notice thereof, a new trial, where that distinction
is observed, is desirable, and that in such case the affirma-
tive averments of the answers should not be deemed to
supply the omission of a· necessary allegation in the com-
plaint. It would shock all sense of justice to permit an
averment in the answers to relieve plaintiff from the effect
of its failure to make an essential allegation in its com-
plaint, when no party to the action, not even the plaintiff
itself, ever gave to such averment in the answers the value
or effect that would have been given it by all the parties
had the averment been pleaded by the plaintiff in its com-
plaint with the intent and purpose that that party . now
seeks to attribute to it as it is pleaded in certain of the
answers.

Our conclusion that a new trial should be had, and
plaintiff be permitted to amend its complaint, should it
be so advised, accords with what was said by Mr. Justice
Wilbur in the opinion filed by him in the Rhode case:
"I think," says Mr. Justice Wilbur, "that the finding

that Knapp was the agent of the defendants in purchasing the capital stock is sufficiently sustained by the evidence and the inferences properly deducible therefrom. In view of the fact, however, that the finding is a general one and that it is fairly apparent from the record that neither court nor counsel had in mind the difference between the liability of the subscribers and transferees for the unpaid subscriptions resulting from the overvaluation of the property received in exchange therefor, I am satisfied that a new trial, where that distinction is observed, is desirable.''

For these reasons we are satisfied that, except as to the defendant O'Brien, who unquestionably was a party to the original fraudulent transaction, the judgment should be reversed with leave to plaintiff, should it be so advised, to amend its complaint to conform to the rule enunciated in the Rhode case.

2. It cannot be held, as a matter of law, that the finding that plaintiff had knowledge of facts sufficient to put it upon inquiry respecting the fraudulent issue of the 2,000,000 shares for overvalued properties counteracted the trial court's other finding that plaintiff extended credit to the Panama Oil Company without any actual knowledge of that fraudulent stock transaction. There are, it is true, some loose expressions used by certain of the text-writers to the effect that the issuance of watered stock is binding as against subsequent creditors with constructive notice of the facts. But no case squarely in point has been called to our attention; and we think that, on principle, creditors who extend credit to the corporation with only constructive notice of the fraud practiced upon them are not necessarily precluded from a recovery.

Whether a recovery from the stockholders can be had by a creditor who, without any actual knowledge of the circumstances of the fraudulent transaction that resulted in the issuance of the watered stock, had notice, nevertheless, of facts sufficient to put an ordinarily prudent person upon inquiry, that is, whether a recovery can be had by a creditor who had constructive notice only, presents a question that must be determined in accordance with principles that are a part of the body of the law of fraud. The reason why a subsequent creditor who has actual notice of the real state of affairs cannot disturb the arrangement

between the company and its stockholders is that one who has such notice cannot claim that he was deceived by the false representation as to the amount of capital available for the satisfaction of the company's debts. The capital of a corporation is the basis of its credit. It is a substitute for the individual liability of those who own its stock. Persons deal with the corporation and give it credit on the faith of its ostensible capital—on the strength of the appearances created by its articles of incorporation whereby it proclaims to the world that it is capitalized for a certain amount. Persons extending credit to the corporation have the right to assume that it has paid-in capital to the amount which it represents itself as having; and if they extend credit on the faith of that representation, and' if the representation is false, a fraud is thereby perpetrated upon them—as much so as if the corporation's officers had secured the extension of credit by the direct and express representation that all subscribed stock had been issued for its full par value in money or money's worth. If the corporation becomes insolvent, the law, upon the plainest principles of common justice, says to the delinquent stockholder, "Make that representation good by paying for your stock." It is the misrepresentation of fact in stating the amount of capital to be greater than it really is that is the true basis of the liability of the stockholder in such cases. It follows, therefore that it is only those creditors who have relied, or who can fairly be presumed to have relied, upon the professed amount of capital, in whose favor the law will recognize and enforce an equity against the stockholders. [3] It is impossible for creditors with *actual* notice of the circumstances under which the watered stock was issued, and of the value of the property taken in exchange therefor, to have acted on and trusted appearances rather than the true condition of affairs. It is impossible that creditors with such notice could have been deceived. And since fraud is the sole basis of the right of recovery in such cases (*Rhode* v. *Dock-Hop Co., supra*), there can be no recovery by a creditor who was not deceived by the corporation's apparent or ostensible capitalization. Such creditor is not defrauded by the taking of overvalued property in payment for stock. (*Sherman* v. *Harley*, 178 Cal. 584, [7 A. L. R. 950, 174 Pac.

901]; *Lea* v. *Iron Belt Mercantile Co.*, 147 Ala. 421, [119 Am. St. Rep. 93, 8 L. R. A. (N. S.) 279, 42 South. 415]; *Hospes* v. *Northwestern Mfg. Co.*, 48 Minn. 174, [31 Am. St. Rep. 637, 15 L. R. A. 470, 50 N. W. 1117].)

[4] Though a creditor cannot claim to have been deceived if, when he extended the credit to the corporation, he had actual knowledge of all the facts connected with the fraudulent issue of the watered stock, it does not necessarily follow that a creditor who possesses only notice of facts sufficient to put an ordinarily prudent person upon inquiry was not in fact deceived. Such a ·creditor, notwithstanding his knowledge of facts sufficient to have put an ordinarily prudent person upon inquiry, may, nevertheless, be actually deceived—he may be deceived by appearances, i. e., by the corporation's ostensible capitalization.

There is a strong line of modern authority to the effect that the doctrine of constructive notice can never be so applied as to prevent a defrauded party from recovering for fraudulent misrepresentations. The rule is stated in Ruling Case Law as follows: "The law of constructive notice can never be so applied as to relieve a party from responsibility for actual misstatements and frauds." (12 R. C. L., p. 376.) The Kentucky court of appeals, in *Trimble* ·v. *Ward*, 97 Ky. 755, [31 S. W. 866], quotes Mr. Bigelow as follows: "If the representations were of a character to induce action, and did induce it, that is enough; for it is not just that a man who had deceived another should be permitted to say to him, 'You ought not to have believed or trusted me,' or 'You yourself were guilty of negligence.'" In *Western Mfg. Co.* v. *Cotton & Long*, 126 Ky. 749, [12 L. R. A. (N. S.) 427, 104 S. W. 758], the court says: "The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has most obvious dangers. But judicial experience exemplifies that the former is the least objectionable, and least hampers the administration of pure justice." In *Ruhl* v. *Mott*, 120 Cal. 676, [53 Pac. 307], cited with approval in *Teague* v. *Hall*, 171 Cal. 668, 671, [154 Pac. 851], the court says: "It is true that where one is justified in relying, and in fact does rely upon false representations, his right of action is not destroyed because

means of knowledge were open to him. In such a case, no duty in law is devolved upon him to employ such means of knowledge.''

However impelling to inquiry the facts may be that put a defrauded party upon inquiry, he may, nevertheless, be put off his guard and misled by the very representation of which he complains. ''Whether the victim is actually misled is always an essential inquiry, and that the means of knowledge were open to him, were indeed easily available, and nothing but gross negligence would have failed to discover the falsehood, do not prevent an inquiry into the truth as to whether he in fact had the knowledge, and was in fact misled by the stratagem of his adversary.'' (*Western Mfg. Co.* v. *Cotton & Long, supra.*) In *Fargo Gaslight & Coke Co.* v. *Fargo Gas & Electric Co.*, 4 N. D. 219, [37 L. R. A. 593, 59 N. W. 1066], it is said: ''The general rule is, and, upon principle, must be, that the question is one of reliance by the buyer upon the false statement of the seller. Whether it was wise for him to rely upon it, whether he was prudent in doing so, whether he is not chargeable with negligence in a certain sense in not investigating—these inquiries are, in general, immaterial, provided the purchaser has in fact been deceived.'' Mr. Bigelow, after citing many cases illustrative of the principle here stated, sums up thus: ''The result appears to be, not only in principle but by the weight of authority, that the party to whom the representation is made is affected by means of knowledge, or by notice, only where the language or conduct was not of a kind to withdraw his attention from what otherwise he would be bound to know, i. e., only where the representation was not calculated to put him off his guard, as in cases of representations of value or opinion.'' (1 Bigelow on Fraud, p. 528.) To use the language of another author: ''The doctrine of notice has no application where a distinct representation has been made. A man to whom a particular and distinct representation has been made is entitled to rely on the representation and need not make any further inquiry, although there are circumstances in the case from which an inference inconsistent with the representation might be drawn.'' (Kerr on Fraud and Mistake, p. 80.) The true principle as to the applicability of the doctrine of

constructive notice in cases of fraud is well put by Mr. Pomeroy in his Equity Jurisprudence (volume 2, section 895) thus: "The *mere existence of opportunities* for examination, or of sources of information, is not sufficient, even though by means of these opportunities and sources, in the absence of any representation at all, a constructive notice to the party would be inferred; the doctrine of constructive notice does not apply where there has been such a representation of fact."

Undoubtedly, where there has been no misrepresentation, a knowledge of facts sufficient to put a person upon inquiry amounts in law to constructive notice of facts which might have been learned by such inquiry reasonably prosecuted; but the fraudulent representation of a fact cannot be counteracted by any such implication of notice. The doctrine of constructive notice is, therefore, inapplicable to persons who have extended credit to a corporation whose stock is watered, for, as said in the Rhode case, an action against the holder of watered stock is "essentially one to compel the defendant to make good *a false representation* in defraud of the plaintiff." (Italics ours.)

Our conclusion is that the effect of the finding that the plaintiff extended credit to the Panama Oil Company without actual knowledge of the fraudulent transaction pursuant to which the watered stock was issued, is not, as a matter of law, overcome by the other finding that the plaintiff had notice of facts sufficient to put it upon inquiry. The ultimate question, a question of fact for the trial court, to be determined from a consideration of all the circumstances and the inferences reasonably deducible therefrom, is this: Can it fairly be presumed that at the times when plaintiff extended credit to the Panama Oil Company it relied upon the company's ostensible capitalization? Can plaintiff be fairly presumed to have relied upon the misrepresentation of fact arising out of the deceptive appearances created by the apparent existence of an amount of capital greater than that which the company really possessed?

[5] 3. There is no merit in the claim thaat the stock which is a part of the 1,000,000 shares that Hedrick turned back into the treasury, and which later was issued by the corporation for sums less than par, is within the

doctrine of *Clark* v. *Bever, Fogg* v. *Blair, Handley* v.
*Stutz,* and *J. F. Lucey Co.* v. *McMullen, supra.* These
shares, when issued, were not the shares of an insolvent
corporation, received by a creditor in payment and dis-
charge of his debt, at less than par, and at a value in
excess of the actual market value—as was the case in *Clark*
v. *Bever.* Neither in *Clark* v. *Bever* nor in *Fogg* v. *Blair*
was the stock taken in any sense as an investment,
but was accepted by the creditor, in each instance, as the
best settlement obtainable from an insolvent corporation.
Neither is this the case of a going corporation whose capi-
tal stock has become impaired or diminished by losses or
misfortunes. It is true that in some sense the Panama Oil
Company had been doing business in a small way for a
month or more before all of this so-called "treasury"
stock had been issued; but there is no evidence that its
capital had been impaired by losses. These shares, whether
the purchasers thereof knew it or not, were sold by the cor-
poration in accordance with the original scheme of the pro-
moters. The purchasers of this "treasury stock" bought
their shares as an investment in a corporation that had
hardly begun the business for which it was organized.
The arrangement by which these shares were to be sold by
the corporation for less than their par value was, therefore,
subject to the contingency that, in the event of the in-
solvency of the corporation, the holders of the stock,
if fairly chargeable with knowledge of the original fraudu-
lent transaction, would be liable to creditors who became
such in ignorance of the arrangement and who might right-
fully assume that the stock had been fully paid up or
would be subject to call.

[6]   4. The doctrine enunciated in the South Mountain
Mining Company case (7 Sawy. 30, 5 Fed. 403; 8 Sawy.
366, 14 Fed. 347) has never been approved by the courts
of this state. With respect to the character of liability
here sought to be enforced, mining corporations are not at
the present day *sui generis.* Notwithstanding the frequency
with which corporations incorporated to exploit oil-bearing
lands are organized with a fictitious capital, persons who
have occasion to deal with them are not bound to antici-
pate such a condition of affairs, but may assume that the
capital is what it purports to be. The idea that the capital

of a mining corporation is a football, to be thrown into the market for the purpose of speculation, is an invention that, though often resorted to by stockholders to escape liability, has always been rejected by our state courts; and the rule stated by the federal courts in the South Mountain Mining Company case no longer expresses the rule in force in California. (*Hasson* v. *Koeberle,* 180 Cal. 359, [181 Pac. 387].)

5. It will not be necessary to consider whether the evidence supports the finding that defendant Morgrage is a stockholder of the Panama Oil Company; for, on a retrial of the case, the evidence may not be the same, with respect to this issue, as that now presented to us by the record on this appeal. The principles by which court and counsel should be guided on the retrial of this issue appear to be few and simple: [7] The relation of a stockholder to a corporation is one of contract, either express or implied. It exists only when a party has expressly consented to become a stockholder, or his conduct is such that in law his consent will be implied. He cannot be made a stockholder without his consent, simply because some officer of the corporation, without authority, has entered his name upon the books as a stockholder and caused stock to be issued in his name as such. To establish the relation of a stockholder, it must appear that the minds of the parties met; that the one to whom the stock was issued agreed to be and become a stockholder in the corporation, with the privileges and responsibilities of that relation; and that the corporation accepted him as such. The former could not be put in that position against his will, or without his consent, by the unauthorized and unratified act of a third person; for in such case there would exist no contract relation, no mutuality of agreement, but simply a mistake or a wrong, which the person to whom the stock ostensibly had been issued might ratify and condone, or repudiate and reject. (*Welch* v. *Gillelen,* 147 Cal. 576, [82 Pac. 248]; *Glenn* v. *Garth,* 133 N. Y. 18, [30 N. E. 649, 31 N. E. 344].) [8] If one to whom an unauthorized certificate has been issued without his knowledge and consent, instead of returning the certificate to the corporation, indorses it and delivers it to another for transfer, that act, *unexplained,* is a recognition of ownership, and, consequently, a ratification of the

original unauthorized issue. (*Glenn* v. *Garth, supra.*) But to contend successfully that one to whom stock originally was issued without his authority, knowledge, or consent, subsequently became a stockholder by ratifying the unauthorized issue, it must be made to appear satisfactorily that there was a conscious and intended approval of the issuance of the stock in his name. Ordinarily, ratification, like a contract, includes within it an intention. An indispensable element of a contract is a meeting of the minds upon the subject of the contract. And a ratification is the adoption of what would have been a previously formed contract had there been a meeting of minds. (*Gallup* v. *Fox,* 64 Conn. 491, [30 Atl. 756].) Ratification implies a conscious and intended approval of the act done. It rests upon an actual and existing purpose to make such approval. Hence it must occur with full knowledge of all the facts. (*Glenn* v. *Garth, supra.*)

Because plaintiff failed to allege or prove that any of the defendants other than O'Brien participated in or knowingly benefited by or had any notice of the fraudulent transaction whereby the watered stock was issued, it is ordered that the judgment be and it is affirmed as to the defendant Robert F. O'Brien, and, as to the other defendants, it is reversed, and the superior court is directed to permit plaintiff to amend its complaint, should it be so advised.

Works, J., and Craig, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 28, 1921.

All the Justices concurred.