Argued February 11, affirmed as to Tenny and Prael and reversed as to Beall, March 9, rehearing denied June 22, 1926.

## MARSHALL–WELLS COMPANY v. H. O. TENNEY

### ET AL.

#### (244 Pac. 84.)

Guaranty—Letter of Credit Should Receive Fair and Reasonable Interpretation.

1. Letter of credit should receive a fair and reasonable interpretation according to true import of its terms, and what may be fairly presumed to have been intention and understanding of parties with a view to furtherance of its spirit, and in order to attain object designated.

Guaranty—Rule of "Strictissimi Juris" is Applicable When Guarantor's Undertaking has been Determined, and One Claiming Benefit of Guaranty must Show That Its Terms have been Complied With.

2. After scope of guarantor's undertaking has been determined, rule of *"strictissimi juris"* applies, which is that guarantor can have

---

1. See 12 R. C. L. 1074.

his undertaking as thus determined strictly construed, and he can insist on strict performance of any terms or conditions which have been stipulated, and it is incumbent on one who claims benefit of guaranty to show that its terms have been strictly complied with.

**Guaranty — "Extensions" Contemplated in Letter of Credit were Ordinary and Usual Extensions for Time of Payment Given in Transaction of Business.**

3. Letter of credit to secure sales to corporation in which defendants were interested, and to continue in force notwithstanding any change in form of indebtedness, or renewals or extensions granted by creditor, etc., contemplated "extensions," which were ordinary and usual extensions for time of payment, such as are usually given in transaction of business.

**Guaranty—Any Material Change in Obligation of Principal Debtor in Guaranty Without Guarantor's Consent will Release Guarantor from Liability, if Taking Place Before His Liability is Finally Settled.**

4. Any material change in obligation of principal debtor to which guaranty relates will release guarantor from liability, unless made with his consent, if such change takes place before guarantor's liability is finally settled.

**Guaranty—Letter of Credit Securing Sales to Corporation in Which Guarantors were Interested was Binding on Guarantors When Delivered to Creditor Without Notice of Acceptance.**

5. Letter of credit to secure sales to corporation in which guarantors were interested was binding on guarantors when delivered to creditor without notice of acceptance by creditor.

**Guaranty—Letter of Credit Permitted "Extensions" of Time of Payment or Forbearance by Creditor Without Consent of Guarantors Interested in Corporation as Long as Assets and Business of Debtor Corporation were not Tied Up.**

6. Letter of credit to secure sales to corporation in which guarantors were interested, and to continue in force notwithstanding any change in form of indebtedness, or renewals, or "extensions" granted by creditor, permitted extensions of time of payment or forbearance by creditor without obtaining consent of guarantors so long as assets and business of corporation were not tied up.

**Subrogation—Guarantor Required to Pay Obligation can be Subrogated to Creditors' Rights Against Principal Debtor.**

7. If principal debtor defaults in his obligation, and guarantor must pay same, he can be subrogated to creditors' rights, and may proceed against principal debtor for reimbursement.

---

5. Necessity of notice of acceptance to bind guarantor, see notes in 16 L. R. A. (N. S.) 353; 33 L. R. A. (N. S.) 960; 48 L. R. A. (N. S.) 198. See, also, 12 R. C. L. 1069.

7. Right of accommodation party who is obliged to pay bill or note to recover from the accommodated party, see note in 37 L. R. A. (N. S.) 783. See, also, 12 R. C. L. 1098.

**Guaranty—Letter of Credit Held Discharged by Transfer of Prin-. cipal Debtor's Business to Creditors Who Agreed to Refrain from Enforcing Payment of Their Obligations so That Guarantor Could not Protect Himself by Subrogation to Creditors' Rights.**

8. Letter of credit to secure sales to corporation in which guarantor was interested, and to continue in force notwithstanding any change in form of indebtedness, or renewals, or "extensions" granted by creditor, *held* discharged by radical change in method of business of corporation without consent of guarantor and turning over of its entire business to creditors who agreed to refrain from enforcing payment of their obligations so that guarantor could not protect himself by subrogation of rights of creditors.

**Corporations—Agreement to Conduct Business of Debtor Corporation Until Business Should be Wound Up, or as Committee Might Advise, Held not Invalid as Being for Indefinite Time.**

°9. Creditors' agreement to conduct business of debtor corporation as long as creditors' committee deemed it in best interest of creditors to continue, and business to be discontinued, liquidated and wound up at any time committee recommended, *held* not invalid as being for an indefinite time.

Guaranty, 28 C. J., p. 903, n. 84, p. 904, n. 92, p. 935, n. 33, p. 936, n. 37, 38, 40, p. 994, n. 81, p. 995, n. 82, p. 996, n. 9, p. 998, n. 21, p. 1003, n. 68, p. 1037, n. 82.

From Multnomah: GEORGE TAZWELL, Judge.

Department 2.

This is an action to recover money, based upon a letter of credit or guaranty. The cause was tried by the court without the intervention of a jury. Findings of fact and conclusions of law were made and a judgment entered in favor of plaintiff. Defendants appeal assigning error.

The guaranty is in the following words and figures:

"LETTER OF CREDIT.
                "Portland, Ore. 9/4, 1917.
"Marshall-Wells Hardware Company,
        "Portland, Oregon.
"Gentlemen:
    "In consideration of the sum of One dollar ($1.00) to me in hand paid, receipt whereof is hereby acknowledged, and the further extension of credit granted by Marshall Wells Hardware Co. to Mult-

nomah Iron Works, I hereby unconditionally guarantee payment of whatever amount said Multnomah Iron Works shall at any time be owing to the said Marshall-Wells Hardware Co. on account of goods hereafter delivered whether said indebtedness is in the form of notes, bills or open account. This shall be an open and continuing guaranty and shall continue in force notwithstanding any change in the form of such indebtedness, or renewals or extensions granted by you, without obtaining any consent thereto, and until expressly revoked by written notice from me to you, and any such revocation shall not in any manner affect my liability as to any indebtedness contracted prior thereto.

"Notice of indebtedness and of default in payment are hereby waived. Liability under this guaranty shall at no time exceed the sum of $10,000.00

"(Sig.)   H. O. TENNEY.
"O. B. PRAEL.
"JNO. S. BEALL."

At the time he signed the instrument Mr. Beall was a director of the Multnomah Iron Works and the president of the corporation. At the time Mr. Prael and Mr. Tenney signed the instrument they were also directors of the Multnomah Iron Works.

Mr. Beall stayed with the corporation until July, 1920, when he sold all of his interests in the Multnomah Iron Works and resigned as president and director of the company.

When the above instrument was signed the Multnomah Iron Works was indebted to the plaintiff corporation to the extent of about $5,000 for merchandise sold. Mr. McVay, credit manager of plaintiff corporation, at that time requested a guaranty to be signed by Beall, Prael and Tenney, for $10,000 before he would extend additional credit to the Multnomah Iron Works.

Between the date of the alleged guaranty and the 1st of January, 1921, plaintiff corporation sold and delivered to the Multnomah Iron Works nearly $83,000 worth of merchandise, and this merchandise was paid for, excepting about $14,838, which was the balance owing plaintiff corporation by the Multnomah Iron Works on January 1, 1921.

On the seventh day of February, 1921, the Multnomah Iron Works was unable to meet its obligations in the ordinary course of business. An agreement was made by the Multnomah Iron Works with its principal creditors which provided as follows:

"Whereas, the Multnomah Iron Works, a corporation under the laws of the state of Oregon, doing business in Portland, Oregon, is financially embarrassed, and is unable to meet its obligations in the ordinary course of business; and whereas, said corporation has assets which should be conserved, consisting, among other things, of a large amount of manufactured material, and a large amount of other material on hand, and ready for immediate manufacture, all of which might, if sold in the ordinary course of business, with a minimum necessary expense, be made to pay its debtors either in full or a very considerable portion thereof; and whereas, it is desirable to avoid the expense and delay of court proceedings; and whereas, no preferences have been given by said corporation to any of its creditors and it is the intention of the corporation to treat all creditors alike and to pay each and every creditor in proportion to their respective claims and demands, but owing to the market conditions considerable time will necessarily elapse before said assets can profitably be sold; now, therefore, it is agreed that the title to the assets of said corporation shall remain in the corporation, and that the business shall be conducted by H. O. Tenney, Esquire, as manager under the supervision and general direction of a committee of representatives of the principal creditors of said corpora-

tion, to wit: J. G. Beckett, representing Marshall-Wells Company, Edwin Newbegin, Representing R. M. Wade and Company, F. C. Lewis, Representing Simonds Manufacturing Company, P. L. Adams, representing John Woods Iron Works, F. Rekate, representing the Wiggins Company, and J. C. Bayer, representing J. C. Bayer and Company; that the books of the corporation shall at all times be open to the inspection of said committee, or of any of said creditors; that the committee shall have control of the amount, kinds and quality of goods purchased, salaries and wages to be paid the manager and other employees and such other details of the business as may be necessary to conduct the same to the best possible advantage in the interests of the creditors; that all moneys derived from the sale of merchandise, collections and other sources of revenue, shall be applied first to the payment of taxes, wages, salaries, rent, purchase of new goods, insurance and other legitimate expense incurred in conducting the business, and that after meeting these current obligations, the surplus on hand shall from time to time be transferred to R. L. Sabin, Secretary of the Merchants' Protective Association for *pro rata* distribution among the respective creditors and dividend shall be made as often as sufficient is realized to pay five per cent to each of the creditors; that the business of the corporation shall be continued during such time as said committee or its successors shall deem it in the best interests of the creditors to have it continue and that the same shall be discontinued, liquidated and wound up at any time said committee may so recommend; and the said Multnomah Iron Works expressly undertakes and agrees that it will make such necessary transfers of its assets as may be necessary to carry out the wishes of said committee in case said committee shall decide at any time that immediate liquidation is advisable. And it is further agreed by the creditors of said Multnomah Iron Works that they will extend the time of payment of their respective claims and demands, and

receive and accept their *pro rata* payments in accordance with the tenor of this agreement and that they will not bring any suits or action, or otherwise endeavor to enforce payments of their claims by legal process, but having full trust and confidence in the corporation and the committee above named, will give such extension of the time for payment of their demands as in the opinion of the committee may be advisable.''

The Multnomah Iron Works was engaged in manufacturing machinery and was doing a machine-shop business. Its principal product of manufacture was drag-saws. About the time the agreement was made it was undertaking the manufacture of a one-man harvester.

After this agreement was entered into the committee took charge of the business of the Multnomah Iron Works, defendant H. O. Tenney, acting as manager under the supervision and control of the creditors' committee. Soon after an inventory and appraisement of the stock and assets of the Multnomah Iron Works was made and completed about April, 1921, the values were fixed, as stated, at cost prices, the information in regard thereto being received from Mr. Tenney. The inventory and appraisement showed that at the time the committee took charge of this business, the company had assets of the value at cost price of $142,870, which did not include bills receivable, which at face value amounted to seven or eight thousand dollars. At that time the liabilities of the Multnomah Iron Works were estimated at about $121,000.

The business was continued under the supervision and control of the committee from about February 7, 1921, until about August 18, 1922. A few harvesters, some seven or eight, were manufactured and sold

throughout the Willamette Valley on credit and notes were taken therefor. The market at that time for drag-saws was "glutted"; occasionally one would be sold. The overhead expenses were continued but reduced. New merchandise was purchased, usually from the different creditors, one of whom was the plaintiff. The merchandise purchased, after the committee took charge, was treated as a preferred claim and paid for from the funds of the concern. During this period, but apparently without the approval of the committee, money was expended experimenting with a patented flax-puller in which Mr. H. O. Tenney was interested, which was exhibited by him at the state fair in the fall of 1921, which attracted the attention of the committee to the matter and met with their disapproval.

The record does not disclose how much new merchandise was purchased during the period of about eighteen months, nor what volume of business was done in the way of manufacturing machinery, or what amount of goods was sold. About August 18, 1922, the best possible price that could be obtained for the assets of the Multnomah Iron Works was sufficient only to pay the creditors twenty-five cents on the dollar. An agreement was entered into between the plaintiff and the defendants by which it was agreed that the plaintiff might accept said twenty-five cents on the dollar on any claim which it had against the Multnomah Iron Works and in consideration thereof, release and discharge its claim against the Multnomah Iron Works. It was further agreed that the defendants would not contend that the acceptance of said twenty-five cents on the dollar would in any way release or discharge defendants on any liability which they might owe plaintiff on account of the al-

leged guarantee; that the defendants would not plead or attempt to prove said fact as a defense to this action. It was, however,. further expressly agreed that the defendants were not waiving any other defense which they might have to the action, and it was expressly agreed that the defendants might plead and prove as a defense any act which the said plaintiff or its representatives did or failed to do under or pursuant to the agreement which was made between the creditors and the Multnomah Iron Works.

AFFIRMED AS TO TENNEY AND PRAEL.    REVERSED AS TO BEALL.    REHEARING DENIED.

For appellants there was a brief over the name of *Messrs. Winter & Maguire,* with an oral argument by *Mr. J. P. Winter.*

For respondent there was a brief over the name of *Messrs. Emmons & Lusk,* with an oral argument by *Mr. Hall S. Lusk.*

BEAN, J.—At the close of plaintiff's testimony, counsel moved for a nonsuit in favor of defendants, which was denied. The principal question on this appeal is, Did the agreement between the plaintiff and other directors of the Multnomah Iron Works, whereby the creditors took charge of the affairs of the Multnomah Iron Works, and the acts performed by the Marshall-Wells Company pursuant to the agreement, in any way affect or release the defendants from liability under the guaranty?

The evidence in the case shows that the creditors' agreement was entered into without the knowledge or consent of defendant John S. Beall, and that after the creditors' agreement the directors of the Mult-

nomah Iron Works had practically no voice in the conduct or operation of the business of the company, except under control of the committee.

The defendants H. O. Tenney and O. B. Prael, at the time the creditors' agreement was made, were directors and officers of the Multnomah Iron Works and took part in the arrangement and in the execution of the agreement and in the proceedings afterward, in the conduct of the business, under the control and supervision of the creditors' committee. They apparently assented to the agreement.

It is contended on behalf of defendant Beall that the creditors' agreement, made without his knowledge or consent, changed the terms of the contract of guaranty and, therefore, discharged the guarantor. In effect, the defendant Beall urges that, after the creditors' agreement was executed, and a committee of the creditors took charge of and conducted the business of the manufacturing plant, sold the products, hired and discharged the help, purchased supplies of merchandise, the plaintiff is attempting to hold Beall as a guarantor of the concern, while it was in the hands of the creditors by their committee; and that this is a different guaranty from what he executed when he signed the letter of credit and substantially changed his contract.

In *Gile Groc. Co.* v. *Lachmund*, 75 Or., at page 124 (146 Pac. 519), we find the language of Mr. Justice WOLVERTON in the case of *Delsman* v. *Friedlander*, 40 Or. 33 (66 Pac. 297), quoted as follows:

"Primarily, it may be stated as a legal proposition sustained and established by the very great weight of judicial opinion that a guaranty of the payment of a note or other obligation is an absolute undertaking to pay it when due, and that no demand or notice of

nonpayment is necessary or requisite to fix the lia-
bility of the guarantor; and that mere passiveness
on the part of the holder will not release such guaran-
tor, even if the maker was solvent at its maturity,
and thereafter became insolvent,"—citing authorities.

1. Letters of credit or guaranty are contracts of
an extensive use in the commercial world upon the
faith of which large credits and advances are made.
A letter of credit should not receive a strict and
technical interpretation but a fair, and reasonable
one, according to the true import of its terms, and
what may be fairly presumed to have been the inten-
tion and understanding of the parties, with a view to
the furtherance of its spirit and in order to attain the
object designed: 28 C. J., p. 936, sec. 81, and notes;
*First Nat. Bank* v. *Hawkins,* 73 Or. 186, 189 (144 Pac.
131); *Staver & Walker* v. *Locke,* 22 Or. 519, 524 (30
Pac. 497, 29 Am. St. Rep. 621, 17 L. R. A. 652);
*W. T. Raleigh Co.* v. *McCoy,* 96 Or. 474, 482 (190 Pac.
311).

2, 3. It is well settled that, after the intention of
the parties or the scope of the guarantor's under-
taking has been determined, by the ordinary rules
of construction either from the instrument itself in
which it is clearly expressed, or from the instrument
and the surrounding circumstances, the rule of
*strictissimi juris* applies, that is, that the guarantor
is entitled to have his undertaking as thus determined
strictly construed and that it cannot be extended by
construction or implication beyond the precise terms
of his contract; and he has the right to insist upon
the strict performance of any terms or conditions
which have been stipulated, and it is incumbent upon
one who claims the benefit of a guaranty to show that

its terms have been strictly complied with: 28 C. J., p. 935, § 80.

Examining the letter of credit, we notice that it provided—

"This shall be an open and continuing guaranty and shall continue in force notwithstanding any change in the form of such indebtedness, or renewals or extensions granted by you, without obtaining my consent thereto and until expressly revoked by written notice from me to you * * "

Referring particularly to the word "extensions," stipulated in the document, we believe that by giving the language used a fair, liberal and reasonable interpretation, as it was intended by the parties at the time the guaranty was given, the extensions contemplated and stipulated were the ordinary and usual extensions for time of payment, such as usually given in the transactions of business. Such an extension of time was consented to by the guarantor at the time he signed the letter of credit. The ordinary extension of time is a mutual arrangement and is usually intended to give the debtor a chance to obtain money to pay the debt. It does not necessarily follow that a radical change in the method and business of the principal debtor and the turning over of the entire business of the principal debtor to the new parties and at the same time agreeing to refrain from enforcing payment, all in such a manner that the guarantor would not be in a position to protect himself by taking proper measures to be subrogated to the rights of the creditor, would come within the purview of such a consent.

We notice in Stearns on Suretyship (3 ed.), page 109, Section 78, that—

"If the contractual relation of principal and creditor are changed by the substitution of new parties in place of those originally contracting, either by the original party assigning his interest in the contract to another in whole or in part, or by associating new parties by partnership agreements, the surety or guarantor will be discharged."

4. Any material change in the obligation or duty of the principal debtor to which the guaranty relates, by a change or alteration either in the terms of the contract between the guarantee and the principal or in the manner of its execution, will release a guarantor from liability unless made with his consent if such change takes place before the guarantor's liability is finally settled: 28 C. J., p. 994, § 155, and notes; Stearns on Suretyship (3 ed.), p. 106, § 76, p. 211, § 132, and notes.

5. It is contended on behalf of each of defendants that there is no testimony to show that the guaranty was accepted by Marshall-Wells Company. We see no merit in this contention. The letter of credit was executed by defendants who at that time were all interested in the Multnomah Iron Works, in order to obtain further credit for that concern, and was delivered to Marshall-Wells Company. Under the circumstances of the case, the guaranty appears to have been accepted and acted upon by the parties. In a note in 16 L. R. A. (N. S.), page 355, we read:

"A writing by which a person engages to secure sales made by the parties addressed, to a third person, in a specified sum, is an original undertaking binding on delivery; and no notice of acceptance is necessary." Citing *Newcomb Bros. Wall Paper Co.* v. *Emerson,* 17 Ind. App. 482 (46 N. E. 1018).

Again, on page 356 of the same volume we read a note as follows:

118 Or.—25

"One who signs a letter in which he states that, if the parties addressed will send a specified person such goods as she may order, not exceeding a given amount, he will guarantee payment in full, enters into an absolute guaranty, and is not entitled to notice of acceptance." *Fisk* v. *Stone,* 6 Dak. 35 (50 N. W. 125).

6. As to the mere extension of time of payment or forbearance given or suffered by the Marshall-Wells Company, in conjunction with the other principal creditors to the Multnomah Iron Works by virtue of the agreement, without tying up the assets and business of the Multnomah Iron Works, the terms of the letter of credit permits "extensions" to be granted by Marshall-Wells without obtaining the consent of the guarantor.

This leaves the question as to the effect of Marshall-Wells Company with others on February 7, 1921, binding itself to take over all of the assets of the Multnomah Iron Works, conduct the manufacturing plant and carry on the business of selling machinery and other products, purchasing more goods and merchandise, increasing, at least for the time being, the indebtedness of the Multnomah Iron Works, and generally speculating with the affairs of the distressed concern without notice to, or the knowledge or consent of John S. Beall, one of the guarantors.

In considering this phase of the case it may be necessary to notice as nearly as we can how it might work out, and how it did work out, as far as affecting the obligation of this guarantor. It should be remembered that when the letter of credit was signed, the guarantors were sponsoring the Multnomah Iron Works and no other concern or combination. Their

liability was affected, either increased or diminished, by the contracts, ventures and speculations of the Multnomah Iron Works. The skill and experience of the movers of that concern entered into the undertaking. Even the time of operation and manufacturing, as disclosed by the record, was an important factor to be taken into consideration. When the creditors' agreement was consummated John S. Beall to all intents and purposes was practically a creditor, or liable to be a creditor, of the Multnomah Iron Works and entitled to notice of the arrangements and to have a voice as to what should be done. He had severed his connection with the Multnomah Iron Works some time before this, and was not a participant in the affairs of the concern.

The testimony of Mr. Foss B. Lewis, one of the members of the committee representing the creditors, explained the situation to a certain extent. He testified in part as follows: It was a typical war case. "They [Multnomah Iron Works] were victims of the war boom." Mr. E. R. Newbegin, who was interested in the settlement and taking over of the plant and assets of the Multnomah Iron Works, which concern still had the same at the time of the trial, testified relating to the time of the creditors' agreement as follows:

"Q. What was the condition of the market at that time with respect to—

"A. (Interrupting.) Well, that material was very poor; that was what was the reason—the matter with the company; there was no demand for their goods. In the meantime, taxes and insurance and interest were going on, and they couldn't realize anything from the stuff they had, and that's what got them into trouble.

"Q. There wasn't any market value for this property at that time?

"A. It wasn't saleable at that time."

The trial court found in regard to the creditors' agreement as follows:

### "Finding of Fact IX.

"That on or about the 7th day of February, 1921, the plaintiff herein and other creditors of said Multnomah Iron Works, entered into an agreement in writing with said Multnomah Iron Works, a copy of which is attached to the amended answers of the defendants herein, and marked Exhibit 'A.' That thereafter and until July 18, 1922, the business of said Multnomah Iron Works was managed by the defendant H. O. Tenney, under the supervisory control of the committee of creditors named in said agreement, except that J. G. Beckett ceased to act as a member of said committee until some time in April, 1922. That about July 18, 1922, an arrangement was effected by which the assets of said Multnomah Iron Works were transferred so as to pay the creditors of said Multnomah Iron Works the sum of 25¢ on the dollar of their claims, and by which the plaintiff received payment of the sum of $3,714.86.

"That at the time that said agreement of February 7, 1921, was entered into, the liabilities of Multnomah Iron Works amounted to about $121,000.00, and its assets at said time 'had no market value,' and said corporation was insolvent. That after the 7th of February, 1921, and until the transfer of the assets of said corporation in July, 1922, as aforesaid, the business of said Multnomah Iron Works was conducted and managed with prudence and care and sound business judgment, and nothing was done by said creditors' committee or any of the members thereof with respect to the conduct of said business which in any way depleted or depreciated the value of the assets of said corporation; that the making of said agreement of February 7th, 1921, as well as the supervision thereafter exercised over said business

by said creditors' committee, tended to promote the best interests of said corporation and of the creditors thereof."

It will be noticed that the Circuit Court found that at the time of the agreement the liabilities of the Multnomah Iron Works amounted to about $121,000 and its assets at said time "had no market value." We do not understand that the court found that the property of the Multnomah Iron Works at the time of the inventory had no value. It often occurs when the value of property is necessary to be fixed, that while it has value it has no fixed market value. The record does not disclose what the actual value of the property of the Multnomah Iron Works was at that time.

The court also found that the creditors' committee did nothing to deplete or depreciate the value of the assets of the Multnomah Iron Works. The conduct of the committee is not subject to criticism. No doubt they acted in good faith. But the evidence in the case does not warrant the finding that during the administration of the creditors' committee there was not a shrinkage of the sum total of the assets of the Multnomah Iron Works, when taking into consideration amounts paid out for overhead expenses in running the manufacturing establishment, the purchase of new goods and the general venture. The arrangement was eminently fair to all those who agreed to the same. They thereby stipulated to take their chances as they had the right to do. It is evidently different with one who did not so consent, if he was a creditor or in a situation similar to a creditor.

It appears that a few years before the embarrassment of the Multnomah Iron Works it had made a

profit in the business so that some $15,000 or $16,000 was due the United States government as income taxes for the year. The former management of the business by the Multnomah Iron Works is not criticised. The trouble was, as stated by Mr. Newbegin, and other witnesses, the prevailing conditions.

Now, then, if conditions were such that the Multnomah Iron Works could not make any profit but conducted the business at a loss, did the plaintiff, according to the terms of the guaranty, have the right without notice to the guarantor, to enter into the agreement and subject the principal, the Multnomah Iron Works, under the control of the committee, to the hazard of carrying on a manufacturing business under the conditions mentioned, for a period of eighteen months, incurring new indebtedness by purchasing new goods, and all the time bearing the overhead expense of the manufacturing, all or most of which must of necessity be met with the proceeds of the "quick assets" of the principal debtor. Some of the business done during the time was in an experimental line. The new supplies purchased were mingled with the old assets. The salaries and wages paid the manager and employees either increased the indebtedness, or what is in effect the same thing, were paid out of the assets of the principal, and largely from the "quick assets." These expenses together with "such other details of the business as may be necessary to conduct the same," together with taxes, rent and insurance, according to the agreement, were to be paid first from the "moneys derived from the sale of merchandise, collections and other sources of revenue." The agreement then provides:

"That after meeting these current obligations the surplus on hand shall from time to time be trans-

ferred to R. L. Sabin, Secretary of the Merchants'
Protective Association, for *pro rata* distribution
among the respective creditors. * * That the business
of the corporation shall be continued during such
time as said committee or its successors shall deem
it in the best interest of the creditors to have it con-
tinue; that the same shall be discontinued, liquidated
and wound up at any time said committee may so
recommend."

During this eighteen-month period the result of
the venture had a material effect upon the rights and
liability of the guarantor. The amount claimed by
plaintiff as the liability of defendant Beall was fixed
as of the date of the sale of the assets. What the
net loss was during this time is not shown by the
record. It appears to be impossible to segregate the
new business from the old, so as to show the net re-
sult. It all went in with the old assets and liabilities.
It is plain from the record that if the new arrange-
ment, under the creditors' committee, had continued
long enough there would have been nothing to pay
the creditors a percentage. During this period of
eighteen months of speculation, John S. Beall is
claimed to be a guarantor, not of the Multnomah
Iron Works, according to the contract of guaranty,
but for a different concern, viz., the Multnomah Iron
Works, under the control and direction of the credi-
tors' committee. The agreement provides that the
committee "shall have control of the amount, kinds
and quality of goods purchased, salaries and wages
to be paid the manager and other employees, and
such other details of the business as may be neces-
sary to conduct the same to the best possible advan-
tage in the interest of the creditors * * ." The
agreement further stipulated:

"It is further agreed by the creditors of said Mult-nomah Iron Works that they will extend the time of the payment of their respective claims and demands, and receive and accept the *pro rata* payments in accordance with the tenor of this agreement, and that they will not bring any suits or actions or otherwise endeavor to enforce payment of their claim by legal process, but having full trust and confidence above named will give such extension of time for payment of their demands as in the opinion of the committee may be advisable."

When the plaintiff entered into this stipulation and ignored the interests of the guarantor, Beall, it in effect elected to look to the concern, under the control of the committee, for the payment of the claim, and not to Beall. Marshall-Wells Company agreed that it "will give such extension of time for the payment of their demands as in the opinion of the committee may be advisable." While the letter of credit provided that Marshall-Wells Company might grant extension to the debtor it did not provide that Marshall-Wells Company might transfer its right to grant extensions to a creditors' committee, so that the claim of plaintiff could never mature or become due, except in the discretion of the creditors' committee. As it developed, this time was about eighteen months. During this time defendant Beall was absolutely powerless to do anything to protect his rights. Nothing was done by plaintiff after the date of the agreement to indicate to Beall that plaintiff contemplated looking to him, until about two months thereafter, when plaintiff wrote a letter to Beall stating that his guaranty was still in effect. Plaintiff, on May 31, 1921, notified Beall that they were holding him on the guaranty and making demand for the amount of $10,000, due it from the Multnomah Iron Works.

After plaintiff received its 25 per cent of its claim, the same was reduced to about $11,000 so that any material adverse speculation with the assets of the Multnomah Iron Works, or the outlay for expenses of running the manufacturing plant under the control of the committee, when it did not produce any substantial income, would prevent a reduction of the original amount of the guaranty which was limited to $10,000.

By entering into the creditors' agreement with the Multnomah Iron Works, Marshall-Wells Company, plaintiff, changed the rights and interests of the guarantor, John S. Beall, without his knowledge or consent.

When the demand was made and when this action was instituted, plaintiff's claim against the Multnomah Iron Works was not due, because, under the creditors' agreement, plaintiff had agreed not to bring any suit or action, or otherwise endeavor to enforce payment of its claim by legal process, and that it would give such extension of the time for payment of its demand as in the opinion of the committee might be advisable, and engage in manufacturing and running the machine-shop. This contract was in force until long after demand was made and until long after action was instituted. This contract, made between the creditors, including plaintiff and the Multnomah Iron Works, therefore, materially changed the obligations of the guarantor, Beall; materially changed his right and interests, and as a matter of law discharged him.

7. One important remedy is secured to the guarantor as against the creditor. If the principal debtor makes default in his obligation and the guarantor is required to pay the same, he has the right to be

subrogated to the rights of the creditor and may proceed against the principal debtor for reimbursement: 12 R. C. L., p. 1098, §§ 53 and 54.

As stated in Stearns on Suretyship (3 ed.), page 138, Section 98:

"The entire doctrine of subrogation in suretyship is dependent upon the immediate investment of the creditor with the obligations of a trustee whenever any rights or interests of the debtor, applicable to the debt, are placed in his control, and it is the right of the surety to be discharged if the creditor by his voluntary act deprive him of the benefit of this subrogation."

If Beall, the guarantor, had paid the claim of plaintiff at the time the demand was made upon him, or at the time suit was commenced, he would have stepped into the shoes of the Marshall-Wells Company and therefore been bound by the creditors' agreement and would have been compelled to stand by and permit the affairs of the Multnomah Iron Works to be conducted by the creditors' committee. According to the appraisement made by the committee the value of the assets of the Multnomah Iron Works, estimated at cost, was $140,000, and the liabilities of the Multnomah Iron Works at that time did not exceed $121,000.

8. Defendant Beall was prevented from protecting his interests in any manner. If the plaintiff had made demand on Beall to pay what was owing on open account prior to February 7, 1921, and before the creditors' committee took charge, and he had done so, then the guarantor would have been to the extent of $10,000, subrogated to the rights of the plaintiff. He would have held the claim against the Multnomah Iron Works for $10,000, which was due

and owing. He could have brought action on this claim to enforce payment therefor. He could have compelled the sale of the Multnomah Iron Works at any time. The creditors of the Multnomah Iron Works would have been compelled to consult the rights of the defendant Beall when they took charge of the business. The creditors' agreement would not have been binding upon defendant unless he had consented thereto. Under the guaranty agreement, the defendant Beall had the right to be consulted as one of the creditors of the Multnomah Iron Works.

The plaintiff changed the nature of its claim against the Multnomah Iron Works without the consent of defendant Beall. He was discharged as a guarantor.

9. It is contended on behalf of plaintiff that the agreement made by plaintiff and the other creditors with the Multnomah Iron Works was for an indefinite time and not valid. The agreement plainly stipulates "that the business of the corporation shall be continued during such time as said committee or its successors shall deem it in the best interests of the creditors to have it continue and that the same shall be discontinued, liquidated and wound up at any time said committee may so recommend * * "

Plaintiff agrees that it "will give such extension of the time for payment of their demands as in the opinion of the committee may be advisable." The time fixed was when the business should be wound up or as the committee might advise. We think the agreement was valid and was to extend until the happening of the certain event mentioned.

The findings made by the lower court are not supported by the evidence and are erroneous.

At the close of all the testimony counsel for defendants submitted and requested findings in favor of defendants.

The judgment of the Circuit Court is reversed as against defendant John Beall and affirmed as against defendant H. O. Tenney and O. B. Prael.

AFFIRMED AS TO TENNEY AND PRAEL. REVERSED AS TO BEALL. REHEARING DENIED.

McBRIDE, C. J., and BROWN and BELT, JJ., concur.