POWERINE CO. v. RUSSELL'S, Inc., et al.

No. 6530. Decided April 7, 1943. (135 P. 2d 906.)

442

Rehearing denied July 23, 1943.

*Charles D. Moore,* of Salt Lake City, *B. F. Napheys, Jr.,* of Denver, and *E. A. Rogers,* of Salt Lake City, for appellant Powerine Co.

*Van Cott, Riter & Farnsworth,* of Salt Lake City, for appellant John H. Russell.

*Stephens, Brayton & Lowe,* of Salt Lake City, for respondent.

LARSON, Justice.

Plaintiff sought a judgment for $6,812.87, with interest from February 8, 1940, alleged to be due for gasoline and petroleum products sold on open account; to foreclose a chattel mortgage given to secure this indebtedness, and for $700 attorney's fees. Defendant John H. Russell denied liability and filed a counterclaim. He set up a lease of real estate made by him to plaintiff, alleged breach of certain covenants, and asked for rescission and cancellation of the lease. He also alleged plaintiff had committed waste on the premises and prayed triple damages in the amount of $1,500. In reply, plaintiff denied the allegations of the counterclaim, and asked that the lease be reformed to include some land alleged to have been omitted from the description in the lease through mutual mistake. The court found against plaintiff on the issue formed by the complaint, and in favor of plaintiff on the counterclaim, denying rescission and granting reformation of the lease. Each party appeals from that part of the judgment against him.

The fact situation is rather complex. George R. Russell, a son of the defendant John H. Russell, had been in the retail gasoline business in Salt Lake City for some years before any of the transactions here involved. He had many previous dealings with plaintiff, but always on a strictly cash basis. In August of 1938, he informed the plaintiff, through its local representative Ray W. Shaw, that he intended to expand his operations and eventually incorporate, and would like to arrange to make future purchases of gasoline on a credit basis. He was told that he had no credit rating with the company, and for that reason, the business would have to be continued on a cash basis, and a company formed by him would not be in any better position. Thereafter George secured the form, financial statement, plaintiff's exhibit "A" and had his father, John H. Russell, fill in that form showing John H. Russell's assets thereon. This statement was forwarded to the plaintiff in Denver, and thereafter George made his purchases on a

credit basis. The proposed corporation was not completed until January 1939, though from the time of the receipt of the financial statement petroleum products were furnished to George Russell, the account being listed on the books of the plaintiff as "Russell's Inc." Plaintiff admits there was never any account in the name of John H. Russell personally, and that there were never any sales of petroleum products to him personally.

At the time Russell's Inc. was chartered, John H. Russell took a majority of the stock, and became president of the company. He resigned as president in October, 1939, and has held no office in the corporation since that time.

In February 1940, Russell's Inc. and George Russell personally executed a chattel mortgage to the plaintiff on certain filling station equipment. It provided a schedule for monthly payments on the old account, and an admission that there was then due and owing on the old account, the sum of $7,200. John H. Russell did not sign this chattel mortgage either as an officer of the corporation, or in a personal capacity.

In June of 1940, John H. Russell leased to plaintiff a filling station property belonging to him. The lease was a straight real property lease, with a rental of 1c per gallon on all gasoline sold at the station. In addition to this written lease and the consideration expressed therein, there was also an oral agreement that the differential between wholesale and take wagon prices on all petroleum products of the plaintiff sold on the leased premises should be credited on the delinquent account of Russell's Inc. Defendant also alleges as part of the lease agreement certain other oral promises, to wit: to operate a first-class service station and make every effort to promote the sale of plaintiff's products within the state of Utah; to keep the service station at all times in repair; and to forebear suit on the delinquent account of Russell's Inc. Defendant also claims that the lease was nonassignable, and plaintiff had no right to sublease, because of the personal nature of the obligations therein contained. Plaintiff admits the station premises

were subleased to three different persons. On that ground, and for breach of oral covenants, defendant John H. Russell asked rescission of the lease. Plaintiff in its answer to the counterclaim asked that the lease be reformed to include an additional 60.1 front feet, which it claims were omitted from the lease by mutual mistake of the parties.

Under the view we take of this case, there is but a single theory of liability of John H. Russell which we shall discuss. That is, did the financial statement referred to above have the legal effect of a letter of credit?

The financial statement is on a printed form secured by George Russell and given to his father John H. Russell. It is not a form of, or furnished by, plaintiff. The name and address of John H. Russell are written at the top of the form, and it is filled in so as to be addressed to the plaintiff, and denominated in printing "Individual or Partnership Statement." Then appear the words,

"for the purpose of obtaining credit or the extension or renewal of ———— present indebtedness with you from time to time, ————herewith submit the following as being a fair and accurate statement of my financial condition on August 1, 1938."

A letter of credit as defined in 12 R. C. L. 1065 is "a request whereby one person asks another to advance money or give credit to a third person, and agrees that he will guarantee the same to the person making the advancement or extending the credit." American Jurisprudence, Vol. 24, page 888, defines a letter of credit as "a written instrument by which the writer requests or authorizes a person to whom it is addressed to pay money or deliver goods to a third person, and which evidences an agreement whereby the writer assumes responsibility for payment to the addressee of the amount of the debt. Otherwise stated, a letter of credit is a letter authorizing the addressee to pay money or supply a commodity to a third person on the credit of the writer." This section states that a letter of credit is actually a contract of guaranty, whether so referred to or not. In other words, a letter of credit is a particular class of written guaranty.

In *Liggett* v. *Levy*, 233 Mo. 590, 136 S. W. 299, 301, Ann. Cas. 1912C, p. 72, 73, is the following on this subject:

"Black borrows from 3 Chit. Com. Laws, 336, this definition (Black's L. Dic. tit. Letter of Credit) : 'An open or sealed letter, from a merchant in one place, directed to another in another place or country requiring him, if a person therein named, or the bearer of the letter shall have occasion to buy commodities, or to want money to any particular or unlimited amount, either to procure the same or to pass his promise, bill, or bond for it, the writer of the letter undertaking to provide him the money for the goods, or to repay him by exchange, or to give him such satisfaction as he shall require, either for himself, or the bearer of the letter.' * * *

"Other definitions abound in cases and approved text-writers on banking and commercial paper, but they agree in substance with the foregoing. For example, Daniel (2 Dan. Neg. Inst. [5th Ed.] § 1790) says: 'Letters of credit are instruments of frequent use in commerce, and, while not possessing all the characteristics of negotiability which pertain to bills and notes, partake of them to such an extent as to be necessarily classed as negotiable instruments. A letter of credit may be defined to be a letter of request, whereby one person requests some other person to advance money or give credit to a third person, and promises that he will repay or guarantee the same to the person making the advancement, or accept bills drawn upon himself, for the like amount. * * *'

"That author points out (section 1792) that letters of credit having been in use for many centuries among merchants ('quoting from Hallam's Middle Ages to the effect that general letters of credit, not directed to anyone, were not uncommon in the Levant, even as early as the year 1200, and that orders to pay money to a particular person were introduced by the Jews about A. D. 1183).

"The sum of the matter is that letters of credit are instruments long and well-known to commercial law and mercantile usage. Such a letter is not subject to loose definition. Contra, it has a technical and specific one, fills a well-known office, in effecting exchange, and, while no set form of words may be necessary, yet a letter of credit as known to the law must contain the essential elements pointed out in the definitions quoted. It must fill the office of a request, general or special, to pay the bearer or person named money, or sell him some commodity on credit, or give him something of value, and look to the drawer of the letter for recompense, and it partakes of the nature of a negotiable instrument."

As to the form and sufficiency of a letter of credit, one of the early leading cases on the subject is *Violett* v. *Patton,*

5 Cranch 142, 9 U. S. 142, 3 L. Ed. 61. It there appeared that Violett wrote his name on a blank piece of paper, and then Patton wrote a promissory note above that signature. The court held that it was Violett's intention to give Brook a credit with Patton, and for that purpose, he gave Brook the use of his name, which he signed on the blank piece of paper. This was in intention and effect a letter of credit, upon which the money it was intended to secure, was advanced.

In *Second Nat. Bank* v. *Columbia Trust Co.*, 3 Cir., 288 F. 17, 20, 30 A. L. R. 1299, speaking of the requisites of a letter of credit, the court said:

"but a letter of credit does not have to be in a particular form, if it is such in effect and intention * * * and in effect is a guaranty," citing *Violett* v. *Patton,* supra.

In *Border Nat. Bank* v. *American Nat. Bank*, 5 Cir., 282 F. 73, 76, the obligation of defendant was in the following form:

"We guarantee irrevocably payment for account Joseph De Bona covering purchase * * * drawing on us with railroad bills lading and/or warehouse receipts attached."

The court there said that "a letter of credit is not required to be in any particular form." Going on to say that the promise to accept a draft is equivalent to an acceptance of it.

A letter stating that a credit had been established was held to be a letter of credit in *Lamborn et al.* v. *National Park Bank of New York*, 240 N. Y. 520, 148 N. E. 664, 665, the court saying:

"letters of credit do not usually contain a direct promise to pay. Such a promise is implied or inferred from the statement that credit has been established and is irrevocable."

Quoting from the opinion in *Moss* v. *Old Colony Trust Co.*, 246 Mass. 139, 140 N. E. 803, the court says (Chief Justice

Rugg is particular to point out that no particular form is prescribed for a letter of credit) :

"Their nature and use," he says, "ought to be kept as free as possible from narrowing statements of limitations and from judicial dicta not necessary to a particular decision."

Speaking again of a commercial letter of credit in *American Nat. Bank & Trust Co.* v. *Banco Nacional De Nicaragua*, 231 Ala. 614, 166 So. 8, 13, the court said:

" 'Letters of credit are instruments long and well known to commercial law and mercantile usage. Such a letter fills a well-known office in effecting exchange, and while no set form of words may be necessary, yet a letter of credit as known to the law must contain a request (general or special) to pay the bearer or person named money, or sell him some commodity on credit, and give him something of value and look to the drawer of the letter for recompense, and it partakes of the nature of a negotiable instrument. The rules governing bills of exchange and negotiable promissory notes are always the same, fixed and determinate; while letters of credit are to be construed with reference to the particular and often varying terms in which they may be expressed, the circumstances and intention of the parties to them, and the usages of the particular trade or business contemplated.' " 3 R. C. L. 848.

The court construed the following letter in *Bridge* v. *Welda State Bank*, 222 Mo. App. 586, 292 S. W. 1079, 1080:

"Please honor any sight drafts they should draw on you. Should any of them overdraw, please draw sight draft back of them, with itemized statement, and our bank will guarantee that the draft will be promptly paid."

The court stated:

"a letter of credit is not required to be couched in any particular words or any specific form. * * * The fact that defendant derived no benefit from its promise constitutes no defense to liability on a letter of credit."

The court held in that case that the letter above set out was a letter of credit, a direct and independent promise, and not a secondary obligation as in the case of guaranty.

Giving rules for construction of letters of credit or guaranty, the court says in *Marshall-Wells Co.* v. *Tenney,* 118 Or. 373, 244 P. 84, 87, 45 A. L. R. 1382:

> "Letters of credit or guaranty are contracts of an extensive use in the commercial world, and upon the faith of which large credits and advances are made. A letter of credit should not receive a strict and technical interpretation, but a fair and reasonable one, according to the true import of its terms, and what may be fairly presumed to have been the intention and understanding of the parties, with a view to the furtherance of its spirit, and in order to attain the object designed. * * * It is well settled that, after the intention of the parties or the scope of the guarantor's undertaking has been determined by the ordinary rules of construction either from the instrument itself in which it is clearly expressed, or from the instrument and the surrounding circumstances, the rule of strictissimi juris applies, that is, that the guarantor is entitled to have his undertaking as thus determined strictly construed * * *."

In *Lamborn* v. *National Park Bank,* 212 App. Div. 25, 208 N. Y. S. 428, 436, the court construed together several different letters between the parties, and made a letter of credit out of them. Giving the rules of construction for contracts, as they are applied to letters of credit, the court said:

> "answer to the appellant's contention that, by taking the three letters * * * together, the letter of credit was accepted by Lamborn & Co. * * * is found in the rule that the bank's writings must be taken most strongly against it, and must be construed so as to be reasonable and consistent, and their intent deemed to have been an honorable and honest one." *Doelger* v. *Battery Park Nat. Bank,* 201 App. Div. 515, 194 N. Y. S. 582; *Gillet* v. *Bank of America,* 160 N. Y. 549, 55 N. E. 292; *Schneider* v. *Vietor,* 208 App. Div. 624, 203 N. Y. S. 897.

Quoting from *Gillet* v. *Bank of America,* supra, the court said:

> "If there is any uncertainty or ambiguity as to the meaning of the agreement, it should be resolved in favor of the plaintiff, as it was the defendant who prepared this contract. If there is any doubt as to the meaning of the terms employed, the defendant is responsible for it, as the language is wholly its own."

In *Doelger* v. *Battery Park National Bank,* supra, the court said [201 App. Div. 515, 194 N. Y. S. 586]:

"it should be borne in mind that the letter of extension was written by the defendant, and therefore should be most strictly construed against it,"

and in the recent case of *Schneider* v. *Vietor,* supra, the court said [208 App. Div. 624, 203 N. Y. S. 899]:

"Moreover, the rule is applicable that the construction most favorable to the plaintiff of which the contract reasonably is susceptible should be adopted, since the words were chosen by the defendant."

Applying these rules of construction in the case at bar it should be possible to get the true meaning and purpose of the financial statement, plaintiff's exhibit "A." What meaning should be given to the phrase "for the purpose of obtaining credit"? It should be so construed that the defendant's intent would appear to be a reasonable and honest one, and yet, since in this instance the defendant himself prepared the statement, if there is doubt as to its meaning, it must be construed against the defendant, and in favor of plaintiff, because it was the defendant who used the language. As indicated by the courts, it is also proper to take into consideration the situation of the parties, and what can be determined therefrom, as to their probable intent. It would seem difficult to attribute any meaning to the statement in question but that the defendant was making it for the purpose of inducing plaintiff to extend credit in reliance on the assets there listed.

The record reveals that after some conversations between George R. Russell and plaintiff's agent, and between John H. Russell and plaintiff's agent, George brought the financial statement Exhibit "A" in the action, to defendant John H. Russell, who filled out the same, and gave it to George who delivered it to plaintiff. Upon receipt of the statement plaintiff set up a credit account for Russell's Inc., and sold it gasoline and petroleum products on credit. Defendant John H. Russell testified that when he

made the financial statement he knew it was to obtain credit, but he was not sure who was to have the credit. He admits the credit was not for himself personally, because he was not in the gasoline and oil business. He testified that his son, George, was and had been in the gasoline business, and was contemplating organizing a corporation, which was later formed as "Russell's Inc." He said he had been advised by the general manager of the plaintiff that no credit business could be done with George or a corporation formed by him, because George had no credit rating, and such a rating was required by the company before credit would be extended to any one. In the light of this background he gave the financial statement made by him, to George and allowed him to deliver it to the plaintiff. He further testified that plaintiff's agent told him that he, the agent, knew George was the man with whom they were dealing, but that the plaintiff would not extend credit except upon the strength of a proper financial statement and rating. He intimates the financial statement was given as a result of an understanding between him and the plaintiff's agent as a means of inducing plaintiff's credit department at Denver to allow credit to Russell's Inc., but that he would never be asked to make good on the credit. In the light of this conversation, it is clear that John H. Russell knew he was lending his credit to his son, George, and to Russell's Inc., and that only upon that credit would goods be sold and delivered to them. By his own testimony, he knew, at the very time the financial statement was given to the plaintiff, that the agent was acting wrongfully and without the scope of his authority in telling him he would not be personally liable for the credit, and he knew such representation could not be revealed to the plaintiff, if credit was to be allowed. This, then is the exception to the general rule that the knowledge and acts of the agent will be imputed to the principal, as here the agent was acting adversely to the principal, and therefore his knowledge and actions cannot be imputed to his principal. *Fren-*

*kel* v. *Hudson,* 82 Ala. 158, 2 So. 758, 60 Am. Rep. 736; *Wickersham* v. *Chicago Zinc Co.,* 18 Kan. 481, 26 Am. Rep. 784; *Allen* v. *South Boston R. Co.,* 150 Mass. 200, 22 N. E. 917, 5 L. R. A. 716, 15 Am. St. Rep. 185; *Innerarity* v. *Merchants' National Bank,* 139 Mass. 332, 1. N. E. 282, 52 Am. Rep. 710; *Commercial Bank* v. *Burgwyn,* 110 N. C. 267, 268, 14 S. E. 623, 17 L. R. A. 326. Nor will the courts apply the general rule and impute knowledge of the agent's acts and representations to the principal for the benefit of one who colludes with the agent to cheat or defraud the principal. *Zeidel* v. *Connecticut Gen. L. Ins. Co.,* D. C., 44 F. 2d 843; *Lea* v. *Iron Belt Mercantile Co.,* 147 Ala. 421, 42 So. 415, 8 L. R. A., N. S., 279, 119 Am. St. Rep. 93; *Farnsworth* v. *Hazelett,* 197 Iowa 1367, 199 N. W. 410, 28 A. L. R. 814; *Illinois Cent. R. Co.* v. *Fontaine,* 217 Ky. 211, 289 S. W. 263, 52 A. L. R. 1064.

Because, if we take Russell's story as correct, he did occupy the position of one entering upon a course of dealing with the knowledge that the agent with whom he dealt was not acting in accordance with instructions of his principal, and would not therefore reveal his actions to the principal, he can gain nothing by the statements and representations made to him by the agent, as against the principal.

For the above reasons, we hold that the financial statement was in effect a letter of credit.

In view of the foregoing decision, there is no merit in discussing plaintiff's other assignments of error though it may be said that there is not sufficient evidence to warrant a finding that John H. Russell was liable to the plaintiff on the theory of being a promoter of Russell Inc. As defined in Fletcher Cyc. on Corp., Vol. 1, page 597, a

"promoter includes those who undertake to form a corporation, and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do business," citing *Old Dominion Copper Min. & Smelt. Co.* v. *Bigelow,* 203 Mass. 159, 89 N. E. 193, 40 L. R. A., N. S., 314.

John H. Russell's testimony is to the effect that George talked with him about incorporating, but that he (George) took the required steps to incorporate. There is nothing in the evidence to the effect that John H. Russell took any active part in the various preliminary negotiations to the forming of the corporation, and therefore the conclusion must follow that he could not be considered as a promoter of Russell's Inc.

As to John H. Russell's liability on the chattel mortgage, the only possible theory on which he could be responsible on that instrument is that he was in effect the sole stockholder of the corporation, and it was in fact his alter ego. This involves disregarding the corporate entity to make him personally liable on the chattel mortgage, and for any deficiency after foreclosure sale of the mortgage property. This mortgage was signed by John S. Russell (J. H. Russell's son) as president, and George Russell as secretary for the corporation and George Russell as an individual. It does not appear anywhere in the record that John H. Russell had any part in the execution of the chattel mortgage.

The chattel mortgage was executed on February 8, 1940, and the undisputed testimony of John H. Russell is to the effect that he resigned as president of the corporation in October, 1939. The record does not show what he did with the shares of stock that were issued to him at the time of incorporation, but Russell says that he does not now have any stock in the corporation. It is difficult to see what theory could be used as a basis for any liability on his part, since at the time of the corporate action John H. Russell was not an officer of the corporation. Certainly the fact that three months prior to that he had held a majority of the stock of the corporation, and been its president could be no basis for his liability for this subsequent corporate action.

The next contention which merits some discussion is defendant's theory that his lease of service station property

to the plaintiff is a personal lease, and so non-assignable, and gives the lessee no right to sublease. It is an almost universal rule that a lease of real property is assignable, unless some special circumstances are present. 70 A. L. R. 486; 23 A. L. R. 144; *Abrahamson* v. *Brett et al.,* 143 Or. 14, 21 P. 2d 229; *Peters* v. *Pilcher,* 211 Ala. 548, 100 So. 902; *Edelman* v. *F. W. Woolworth Co.,* 252 Ill. App. 142; *Leff* v. *Satuloff,* Sup., 198 N. Y. S. 22; *Zeltner* v. *Santora,* Sup., 198 N. Y. S. 253; *James H. Herron Co.* v. *Jones,* 28 Ohio App. 190, 162 N. E. 624.

Cases cited by defendant illustrate what special circumstances will justify the courts in holding that the lease is of such a nature as to prohibit the assignment of it. The rule may be stated that when there is a special reliance on the skill or knowledge of the lessee, or when there is contemplated a close association between the lessee and the lessor in the operation of the leased premises, an association requiring a trust in the lessee on the part of the lessor, the courts will hold that the lease is a personal contract and not assignable, and the lessee has no right to sublease. *Nassau Hotel Co.* v. *Barnett & Barse Corp.,* 162 App. Div. 381, 147 N. Y. S. 283; *Arkansas Valley Smelting Co.* v. *Belden Co.,* 127 U. S. 379, 8 S. Ct. 1308, 32 L. Ed. 246; *Meyer* v. *Livesley,* 45 Or. 487, 78 P. 670, 106 Am. St. Rep. 667; *Randall* v. *Chubb,* 46 Mich. 311, 9 N. W. 429, 41 Am. Rep. 165; *Lewis* v. *Sheldon,* 103 Mich. 102, 61 N. W. 269; *Gerould Co.* v. *Arnold Constable & Co.,* 1 Cir., 65 F. 2d 444.

However, the duty of the courts in interpreting leases and other written instruments, is to get the real intention of the parties, and in doing so, the court considers the writing, and also the circumstances of the parties. *Waite* v. *O'Neil,* 6 Cir., 76 F. 408, 34 L. R. A. 550; *Davis* v. *Robert,* 89 Ala. 402, 8 So. 114, 18 Am. St. Rep. 126; *Wrangell Ice Co.* v. *McCormack Dock Co.,* 7 Alaska 296; *Howeth* v. *Anderson,* 25 Tex. 557, 78 Am. Dec. 538; *Marcelle, Inc.,* v. *Sol. & S. Marcus Co.,* 274 Mass. 469, 175

N. E. 83, 74 A. L. R. 1012. When possible, the court should give effect to all words and clauses of the lease, and construe the lease as a whole. *United States* v. *Bostwick*, 94 U. S. 53, 24 L. Ed. 65; *F. B. Fountain Co.* v. *Stein*, 97 Conn. 619, 118 A. 47, 27 A. L. R. 976; *S. Gumbel Realty & Security Co.* v. *L. Feibleman & Co.*, 183 La. 685, 164 So. 627. The majority rule throughout the country is that the lease, in case of ambiguity, is construed most strongly against the lessor, on the theory that he is the party using the language. *Old Time Petroleum Co.* v. *Turcol*, 18 Del. Ch. 121, 156 A. 501; *Cottrell* v. *Gerson*, 296 Ill. App. 412, 16 N. E. 2d 529. However, in the case of the present lease, it actually was prepared by the lessee, and therefore, any ambiguity in the language should be construed against him, as he was the one using the language.

In the instant case, a printed lease form was used, and the words "executors, administrators and assigns" referring to the lessee, were stricken out wherever found. In addition to this, a clause prohibiting subleasing or assigning of the lease was stricken out. It is for the court then to determine the meaning of the lease as finally executed, considering as indicated above, what is contained within the lease itself, and what was stricken out, as well as the circumstances and situation of the parties.

At first glance, it would appear that an inconsistency is created by the striking out of the phrase "executors, administrators and assigns" and also striking the phrase prohibiting subleasing or assigning. However, on a closer inspection it may be seen that the intention of the parties was to restrict the lease to a personal undertaking—just between the lessor and the lessee. The manner in which they evidenced their intention is by striking from the lease form any reference to any person other than the lessor and lessee—the immediate parties to the lease. This is the only way in which this apparent inconsistency can be reconciled, giving effect to all provisions of the lease as written.

This interpretation is strengthened by a consideration of the circumstances of the parties, and what they hoped to accomplish by this lease. Rental for the premises was to be based on 1c per gallon on all gasoline sold there, so that the lessor would be vitally interested in the success of the business there. He would have a vital interest in seeing that an individual or company experienced in the business was in possession of the premises and operating a station there. In addition to this, he would be entitled to an accounting, and while he might be willing to accept an accounting from the Powerine Company, he might well be unwilling to accept an accounting from any lessee they might choose to put into possession. This is especially true as the Powerine Company would have no way of checking on the amount of gasoline sold on the premises other than Powerine products. Since the rental was on the basis of 1c per gallon on *all* gasoline sold, the lessor would then be forced to take the word of the sublessee for the number of gallons of gasoline, other than Powerine, sold on the premises.

Taking all of these considerations together, and keeping in mind that the lease should be strictly construed against the lessee, as stated above, we believe that there is sufficient evidence of the intention of the parties to compel the court to find that the lease was not assignable, and that the lessee was given no right to sublease, and it was error for the court not to so find. Since there was no right to sublease, it was a breach of the provisions of the lease for the lessee to do so, and therefore, defendant John H. Russell should have been granted a rescission of the lease on that ground.

The above holding disposes of defendant's contentions regarding the breach of certain oral covenants, and plaintiff's contention for a reformation of the lease.

We come next to the question as to whether defendant was entitled to an accounting for rental, and for the appli-

cation of the differential under the oral agreement. And we must also determine whether, if he was entitled to such an accounting, the ledger sheets evidence by plaintiff were competent and admissible in evidence in the accounting.

It is apparently not seriously contended that John H. Russell was not entitled to an accounting, as else there was no way for him to determine what he had received, and what he was entitled to under the terms of the lease; what had been credited, and what should have been credited under the terms of the oral agreement regarding the differential. So we have left just the question whether the ledger sheets introduced into evidence were competent evidence on the matters involved in the account. On the record before us, these sheets were competent evidence.

The judgment for plaintiff against defendants George R. Russell and Russell's Inc. is affirmed; the judgment in favor of defendant John H. Russelll and against plaintiff, on the issues raised in plaintiff's complaint, is reversed; the judgment for plaintiff and against defendant John H. Russell on the counterclaim to cancel and rescind the lease and for damages is reversed; the judgment for plaintiff and against defendant John H. Russell reforming the lease is reversed. The cause is remanded to the district court for a new trial as to all issues between plaintiff and defendant John H. Russell, in conformity with this opinion.

Each party to bear his own costs.

WOLFE, C. J., and McDONOUGH, Moffat, and WADE, JJ., concur.